

FILED
2018 Jul-11  PM 01:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ALABAMA SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| JOHNNIE DANIEL CRITTENDEN and DENISE McGOUGH CRITTENDEN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | CIVIL ACTION NO. 2:16-CV-01712-KOB |
| KIA MOTORS CORPORATION, et. al., | ) ) ) | OPPOSED |
| Defendants. | ) ) | |

## PLAINTIFFS' MOTION TO EXCLUDE TESTIMONY OF DEFENSE EXPERTS GREGORY D. STEPHENS AND DAVID M. BLAISDELL PURSUANT TO FED. R. EVID. 702

Plaintiffs challenge portions of the proposed expert opinions of two testifying experts disclosed by Defendants Kia Motors Corporation and Kia Motors America, Inc. ("Kia"), Gregory D. Stephens and David M. Blaisdell, specifically as it pertains to three areas: (1) medical and biomechanical opinions related to the medical condition of Plaintiff Johnnie Daniel Crittenden ("Mr. Crittenden"); (2) the alternative design's predicted effect on Mr. Crittenden's supposed medical condition; and (3) the use of unrelated testing on vehicle seats that are not substantially similar to the subject seat, using forces dissimilar to the rear-end

collision that is the subject of this litigation, to support the opinion that the subject seat is above average or one of the "strongest" seats.[1]

## I.  FACTUAL AND PROCEDURAL BACKGROUND

As the detailed factual background of this case has been previously briefed, only those facts relevant to Plaintiffs' instant motion are set forth herein.

### Subject Vehicle, Seat, and Collision

This is a consumer safety case involving a 2013 Kia Sportage vehicle. (CM/ECF Doc. 1, Compl. at 6).  Mr. Crittenden was paralyzed when the Kia Sportage he was driving ("subject vehicle") was involved in a low-speed, rear-impact collision that caused Mr. Crittenden's seat ("subject seat") to collapse rearward.  (*Id.* at 6-7). The subject vehicle is depicted below:



---

[1] Plaintiffs conferred with counsel for Kia prior to filing this Motion, and Kia opposed Plaintiffs' proposed limitations on the expert testimony addressed herein.

Plaintiffs have alleged that: (1) the subject rear end collision crash circumstances were foreseeable to Kia and its engineers; (2) due to the rear impact, Mr. Crittenden's seat back collapsed and twisted, such that the seat was unable to retain or contain Mr. Crittenden in his seat; and (3) because of the excessive seat collapse, Mr. Crittenden was allowed to ramp up the back of the seat, so that his thoracic spine was positioned at or near the top of the stiff seat back structure, allowing his spine to bend over the top of the seat and causing his debilitating spinal injuries. (*See id.*). Plaintiffs have provided expert testimony supporting these claims and providing testimony regarding available, alternative seat designs that would have prevented Mr. Crittenden's injuries.

### Kia's Experts

Kia's primary defense in this case is that Mr. Crittenden had a pre-existing spinal condition that caused his injuries, such that the subject seat's collapse had nothing to do with causing his paralysis. However, Kia has also maintained that the subject seat was not defective. In support of the position that the subject seat performed appropriately in the subject collision, Kia has disclosed two different research engineers as testifying experts in this case, who work together at engineering firm Collision Research & Analysis, Inc. ("CRA"): Gregory D. Stephens ("Stephens") and David M. Blaisdell ("Blaisdell"). These experts are the subject of Plaintiffs' instant motion.

3

In addition to having the same area of expertise and working for the same engineering firm, Mr. Stephens and Mr. Blaisdell have very similar, sometimes identical, Fed. R. Civ. P. 26 reports in this case. Accordingly, their opinions in the relevant areas, and the reasons for their exclusion, are discussed together, below.

### 1. Opinions Regarding Mr. Crittenden's Medical Condition

Mr. Stephens is not a medical doctor. (Stephens Dep. 12:24-25).[2] He is a research engineer with a Bachelor of Science degree in aerospace engineering. (Stephens c.v.).[3] He did not go to medical school. (Stephens Dep. 13:1-2). He has not had any formal medical training. (*Id.* 13:12-13). He does not examine patients. (*Id.* 13:3-4). He has never diagnosed an individual with a spinal condition. (*Id.* 13:8-11). He has never read imaging studies or films of a spine as part of diagnosing a patient. (*Id.*). He has never been qualified by a court of law to offer expert medical opinions. (*Id.* 13:14-16). His area of expertise is not in medicine, biomechanics, or injury causation. (*See* Stephens c.v.). In fact, Mr. Stephens testified that he would be "leav[ing] injury mechanism" and "kinematic motion" opinions to another one of Kia's experts. (Stephens Dep. 11:4-7, 41:6-17).

Nevertheless, when asked if he intended to testify about Mr. Crittenden's medical condition, Mr. Stephens testified that he had reviewed "all of the available

---

[2] Mr. Stephens's deposition is attached as Exhibit A.
[3] Mr. Stephens's curriculum vitae is attached as Exhibit B.

information on that," and that he was "working with that understanding as it relates to the performance, meaning his preimpact condition explains some of the damage and performance that I have observed." (*Id.* 11:8-17). Mr. Stephens stated, "[W]orking under the **understanding of his spinal condition in terms of how it would posture him in the seat is effectively what I'm using in my seat back evaluation**." (*Id.* 12:3-12 (emphasis added)). Despite admitting that he is not a radiologist or a physician, Mr. Stephens testified that he reviewed medical records and "taking a look at some of the imagery . . . gives me some understanding of how his spine would interact with the seat structure." (*Id.* 12:13-23).

Ultimately, despite his lack of medical or biomechanical expertise, Mr. Stephens intends to testify that the forces in the subject collision "**would not have been at a level to cause serious injury except for [Mr. Crittenden's] especially fragile condition**." (Stephens Expert Report ("Stephens Rep.") at 17 (emphasis added)).[4] Mr. Stephens states in his report, "My understanding is that [Mr. Crittenden's] spine was effectively fused from T2 to L2," although he only cites to another expert's opinion in support of this conclusion. (*Id.* at 3). In fact, while Mr. Stephens wrote in his report that Mr. Crittenden had an exaggerated curve in his

---

[4] Mr. Stephens's expert report is attached as Exhibit C.

spinal column, he testified that he could not quantify it and would have to defer to Kia's biomechanical expert "and others."  (Stephens Dep. 23:4-19).

Like Mr. Stephens, Mr. Blaisdell is not a medical doctor.  (*See* Blaisdell c.v.).[5] He did not go to medical school or receive formal medical training.  (*Id.*).  He is a research engineer with a Bachelor of Science degree and an Associate in Arts degree, both in engineering.  (*Id.*).  His area of expertise is not in medicine, biomechanics, or injury causation.  (*Id.*).  He did not perform an accident reconstruction in this case. (Blaisdell Dep. 15:9-19).[6]  He stated that he would not be offering any medical opinions.  (*Id.* 17:6-8).  He testified that he was relying on one of Kia's experts and treating physicians regarding Mr. Crittenden's medical condition, and he would not be providing an independent opinion about that medical condition.  (*Id.* 17:9-18:7).

Nevertheless, while Mr. Blaisdell testified in his deposition that he would not offer any opinions in the area of biomechanics "as a medical – not any medical questions," he testified that he planned to offer opinions in the area of injury causation and occupant movement and forces, stating: "If you want to call that biomechanics you can . . . ."  (*Id.* 16:7-13).  Mr. Blaisdell further testified as to his "understanding of Mr. Crittenden's medical condition," stating that it amounted to "[t]he condition of the spine, the geometry of his spine, and the effect that has on

---

[5] Mr. Blaisdell's curriculum vitae is attached as Exhibit D.
[6] Mr. Blaisdell's deposition is attached as Exhibit E.

interaction with the seating system in the vehicle and how that can adversely affect the outcome." (*Id.* 18:15-21).  However, when asked for further information as to his understanding of Mr. Crittenden's medical condition, the following exchange occurred:

```
 4  Q   (By Ms. Harris)  Okay.  And to what extent -- and the
 5      medical term I believe is kyphosis; is that right?
 6  A   There's a two word statement I keep seeing, and then two
 7      letters, and I haven't memorized either one of those.
 8  Q   So you are not sure of the medical term for the bending
 9      of Mr. Crittenden's spine that you are referring to?
10  A   I have seen it many, many times in the literature and I
11      haven't tried to memorize the spelling or the
12      pronunciation.
```

(*Id.* 20:4-12).

Despite being unable to spell, pronounce, or remember the terms for Mr. Crittenden's supposed medical condition, Mr. Blaisdell still testified that the subject seat "**will not cause an injury for a person that does not have [Mr. Crittenden's] condition**." (*Id.* 81:8-18 (emphasis added)).  Mr. Blaisdell opined that "photographs show" that Mr. Crittenden had what he "would call a fairly significant curvature of his spine that apparently every - - I thought everybody agreed he had but if they don't agree with that then I think the photographs show what he what he had." (*Id.* 83:15-22).  Mr. Blaisdell also testified that the deformation of the subject seat in the collision was caused by, "A combination of the shape of [Mr. Crittenden's] spine

plus potentially be leaning [sic.] a little bit." (*Id.* 95:7-11). Mr. Blaisdell intends to testify to these opinions to a jury even though he did not perform an accident reconstruction, has no medical background, and is not an expert on biomechanics.

### 2. Opinions Regarding Mr. Crittenden's Medical Condition and Alternative Seat Design

Mr. Stephens opines in his report, "Seats recommended by [Plaintiffs' expert] Mr. Meyer would have posed an exacerbated risk to Mr. Crittenden, given his condition." (Stephens Rep. at 17). Mr. Blaisdell also intends to testify that the "Seats recommended by [Plaintiffs' expert] Mr. Meyer would have posed a special risk to Mr. Crittenden, given his condition." (Blaisdell Expert Report ("Blaisdell Rep.") at 8).[7] In fact, except for using the words "exacerbated" or "special," Mr. Stephens and Mr. Blaisdell have identical opinions in this regard. Mr. Stephens and Mr. Blaisdell have not performed any reconstruction, testing, or medical or biomechanical analysis to support this opinion.

### 3. Comparison of the Subject Seat to Unrelated Testing of Dissimilar Vehicles

Mr. Stephens opines that the subject seat "is well above average in terms of its ability to absorb energy during a rear-force collision and, thereby, to protect its occupants." (Stephens Rep. at 17). According to his report, Mr. Blaisdell also intends to testify that the subject seat "is well above average and is thereby to

---

[7] Mr. Blaisdell's expert report is attached as Exhibit F.

unusually well designed [sic.] to protect vehicle occupants during all types of collisions." (Blaisdell Rep. at 8). Again, the two experts' opinions are highly similar. In support of these opinions, Mr. Stephens and Mr. Blaisdell point to a test they conducted in which they put a weighted block in an exemplar seat, and then applied rearward force on the seat, 14 inches above the seat base cushion, until the seat collapsed and the body block "slipped off." (Stephens Rep. at 9). Notably, this type of push-to-failure testing is completely dissimilar to the forces of the real-world, rear impact in the subject collision.

Further compounding the flaws in this methodology, Mr. Stephens and Mr. Blaisdell took the results of the push-to-failure test they performed on the exemplar seat, and inserted their data into "published charts" of "this type of testing" on other vehicles' seats that "have been available to the scientific community for several years." (Stephens Rep. at 9; Blaisdell Rep. at 7). Notably, as demonstrated below, the chart that Mr. Stephens and Mr. Blaisdell created does not even include the makes or models of most of the other seats tested, nor does it include information about who performed the tests, the underlying test data, or the protocol.



**Figure 19.** *Published chart of seats tested since the 1960s. Chart includes ABTS seats. The Kia Sportage seat is superior in strength to most of the seats on the chart.*

(Stephens Rep. at 10, Blaisdell Rep. at 7). Next, Mr. Stephens and Mr. Blaisdell created two charts comparing the push-to-fail testing they did of the subject seat to other testing that the engineering firm they work for, CRA, has done, the "majority" of which was performed for other litigation (Blaisdell Dep. 50:14-25), on models as old as 1978. Mr. Stephens and Mr. Blaisdell point to these charts as evidence that the subject seat "clearly is at or near the top of conventional seats" tested over the past 30 years.



**Figure 20b.** *Kia Sportage seat is one of the strongest conventional seats that CRA has ever tested.*



**Figure 20a.** *Kia Sportage seat is the strongest conventional seat tested by CRA for recent model years (within the past decade).*

(Stephens Rep. at 10, Blaisdell Rep. at 7).  Notably, the chart compares the subject seat to seats from entirely dissimilar vehicles, including pick-up trucks (like the Ford F-150 and F-250), sedans (a 2008 Toyota Camry), sports cars (like a 2008 Dodge Charger), and SUVs (a 2008 Land Rover).

Mr. Blaisdell could not testify as to which of the tested vehicles depicted in Figures 20a and 20b, above, had active head restraints, or which of the seats tested

11

were driver seats versus passenger seats.  (Blaisdell Dep. 47:7-16).  In fact, when specifically asked whether any of the tested seats were substantially similar to the subject seat, Mr. Blaisdell testified:

```
15  Q   What -- can you tell me which of these seats are
16      substantially similar to the seat in the Crittenden
17      vehicle?
18                  MR. MARTENSON:  Object to the form.
19                  THE WITNESS:  They are all different
20      manufacturers.  They are all designed to hold a person in
21      a car comfortably and reliably over a period of time, but
22      all the designs are different.  If they are different
23      model years, different makes, there's always differences
24      in some part of the design.
```

(*Id*. 48:15-24).

It is entirely unclear from the reports and the charts whether Mr. Stephens or Mr. Blaisdell were directly involved in the tests reflected in their charts.  In fact, Mr. Stephens testified regarding several other Kia vehicles that were tested and reflected in Figures 20a and 20b, above, that **he did not know whether any of those vehicles were defective based on their test results**, because he did not know whether he had studied each one of them.  (Stephens Dep. 76:12-78:14).  Mr. Blaisdell testified that he did not know how many of the depicted tests he was actually present for, but he knew that he was not present for all of them.  (Blaisdell Dep. 45:7-14).

12

It is also impossible to discern whether any tested vehicles have been excluded, or even whether any test data has been excluded, as there is no underlying test data or protocol provided at all.  Mr. Blaisdell testified that, for all of the tests that CRA has run, "I'm not sure that they all got in the list, but they should have.  The idea is to get them in the list," but that he has "no way of knowing" whether all the tests performed were actually included in the charts.  (*Id.* 46:18-24).

Perhaps most importantly, when asked whether the numbers in the chart "tell you how the seat is going to perform in the real world, Mr. Blaisdell responded "Not totally, No."  (*Id.* 53:3-6).  In fact, when asked whether the higher inch-pounds strength number means the seat is better for the occupant, Mr. Blaisdell testified "**It depends primarily, I think, on the condition of the occupant**."  (*Id.* 60:9-13 (emphasis added)).

## II.  ARGUMENT AND CITATION OF AUTHORITY

Kia has disclosed two experts, Mr. Stephens and Mr. Blaisdell, who work at the same engineering firm, have the same area of expertise, and have very similar, near identical opinions in their reports.  Three of these opinions fail to meet the criteria for admissibility under Rule 702, *Daubert*, and its progeny: (1) their attempt to offer biomechanical or medical opinions, which are outside their area of expertise; (2) the opinion that Plaintiffs' expert's alternative seat designs would have posed a "special risk to Mr. Crittenden given his condition," and (3) their attempt to use

testing not performed for this litigation, of dissimilar vehicles, at least some of which they did not personally perform or participate in, involving forces not reflecting those of the subject rear-end collision, to support the opinion that the subject seat design is a "well above average" seat.  (Stephens Rep. at 17).  The reasons that each of these opinions fail to meet the admissibility standard set by the federal rules and case law are set forth below.

## Application of Fed. R. Evid. 702 and *Daubert*

The Federal Rules of Evidence govern the admissibility of expert testimony. *Morris v. Fla. Transformer, Inc.*, 455 F. Supp. 2d 1328, 1330 (M.D. Ala. 2006). Pursuant to the federal rules, primarily Rule 702, the "trial judge serves a gatekeeping function, making both a 'relevance' and a 'reliability' determination, that is, disallowing expert testimony when it will not be helpful to the trier of fact or when it lacks a reliable foundation."  *Id.* (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 587 (1993)).

Specifically, Rule 702 provides that:

[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

The party offering the expert testimony has the burden to establish those admissibility requirements by a "preponderance of the evidence." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999).

When assessing the reliability of scientific testimony, the court should consider the four factors laid out in *Daubert*:

(1) whether the theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) in the case of a particular scientific technique, the known or potential rate of error, and (4) whether the theory or technique is generally accepted by the relevant scientific community.

*Hendrix v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010) (citing *Daubert,* 509 U.S. at 593–94). However, the *Daubert* factors are not an exhaustive list of considerations, and the factors are to be applied flexibly. *Rockhill-Anderson v. Deere & Co.*, 994 F. Supp. 2d 1224, 1230 (M.D. Ala. 2014) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999)). The *Daubert*-type analysis should not be used to "disfavor expert testimony grounded in experience or engineering practice rather than in pure scientific theory." *Rockhill-Anderson*, 994 F. Supp. 2d at 1230; *Morris*, 455 F. Supp. 2d at 1331. However, "if the witness is relying solely or primarily on experience, then the witness must explain how experience is a sufficient

basis for the opinion, and how that experience is reliably applied to the facts.  The trial court's gatekeeping function requires more than simply taking the expert's word for it."  *Morris*, 455 F. Supp. 2d at 1331 (quoting Fed. R. Evid. 702, Advisory Committee Notes, 2000 amendment); *see also Kumho*, 526 U.S. at 157 ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.").

**A.     Mr. Stephens and Mr. Blaisdell failed to provide qualifications, sufficient facts or data, or reliable principles and methods to support medical or biomechanical opinions.**

As an initial matter, Plaintiffs do not challenge Mr. Stephens's or Mr. Blaisdell's ability to testify in the area of their expertise, i.e., seatback structural design from an engineering standpoint.  However, an application of the principles and guidance set forth in Rule 702, *Daubert*, and cases applying *Daubert* compels the conclusion that the two experts must not be permitted to testify to the jury regarding biomechanics or medical opinions, areas clearly outside their area of expertise.  In this regard, Mr. Stephens and Mr. Blaisdell fail to meet any of Rule 702's requirements.

> *1. Mr. Stephens and Mr. Blaisdell are not qualified to offer biomechanical or medical opinions.*

Both Mr. Stephens and Mr. Blaisdell have offered opinions and testimony based on their "understanding of [Mr. Crittenden's] spinal condition."  At trial,

Plaintiffs anticipate that one or both of these experts will attempt to offer the opinion that Mr. Crittenden's injuries were caused by his medical condition, not by the subject seat.    However, neither Mr. Stephens nor Mr. Blaisdell have the qualifications to provide this opinion, which is the first requirement under Rule 702.

Under its gate-keeping function, a trial court must exclude those opinions offered by an expert that are outside or distinct from his or her area of expertise.  *See Montgomery v. Noga*, 168 F.3d 1282, 1303 (11th Cir. 1999) (affirming exclusion of an expert's testimony in an area of software licensing "totally distinguishable" from the area in which he had experience); *Kyser v. Harrison*, 908 So. 2d 914, 919-20 (Ala. 2005) ("[A]n expert may not testify to his opinion on matters outside of his field of training and experience.").  Thus, in *Kyser*, an expert with training in forensic pathology was not permitted to testify in the area of pediatric pathology, "an area of expertise distinct from other disciplines." *Id.* at 919.

In *Morris*, the district court for the Middle District of Alabama was confronted with proffered testimony from an expert reconstructionist that the decedent's injuries were associated with a vehicle collision, as opposed to subsequent roll-over event, based on the expert's "general experience with overturned trucks" and an evaluation of the decedent's injuries.  455 F. Supp. 2d at 1330.  The district court determined that the expert was not qualified by knowledge, skill, training, or education to offer the opinion, as he: (1) was "not a medical doctor"; (2) had "no formal medical

training"; (3) was "not a cause-of-death expert"; (4) had "no training, and is not an expert, in biomechanics"; (5) he did "not hold himself out as an expert on what specific injuries cause death"; and (6) he had "no opinion to a reasonable degree of medical/biomechanical engineering certainty as to what caused the decedent's death." *Id.* at 1332-33.   The district court rejected the argument that the expert was qualified by his experience, nothing, "Although he seems to have extensive experience as an accident reconstructionist, he has not demonstrated adequate experience in determining cause of death."   *Id.* at 1333.   The district court specifically noted, "There is no evidence of the nature and types of accidents [the expert] has investigated in the past and, specifically, of what he learned, through his experience, about the various and differing causes of death in accidents similar to [the] one in which the decedent died."   *Id.*

Here, just like in *Morris*, Mr. Stephens and Mr. Blaisdell should be prevented from offering biomechanical or medical opinions, as those are specialized areas outside their areas of expertise.   Mr. Stephens and Mr. Blaisdell are not medical doctors.   They do not hold medical certifications.   They have not received formal medical training, nor do they have experience in diagnosing or treating spinal conditions.   They do not hold themselves out as medical doctors or biomechanical experts, nor do they offer any opinions to a reasonable degree of medical certainty regarding Mr. Crittenden's medical condition.   (In fact, Kia has disclosed a different

expert to offer biomechanical opinions).  They do not point to other situations in which they have analyzed an individual's spinal condition and its effect or involvement in the performance of a seatback or in a collision.  Ultimately, both Mr. Stephens and Mr. Blaisdell are entirely unqualified, by education, training, or experience, to testify regarding Mr. Crittenden's medical condition, how his medical condition related to the subject incident, or how his medical condition caused or contributed to his injuries in the subject incident.

### 2. Mr. Stephens's and Mr. Blaisdell's opinion of Mr. Crittenden's "condition" is not based upon sufficient facts or data.

Even if Mr. Stephens and Mr. Blaisdell were qualified to offer medical or biomechanical opinions, they have not based these opinions on sufficient facts or data, which is Rule 702's second requirement.  Specifically, both Mr. Stephens and Mr. Blaisdell testified that they were relying on Kia's biomechanical expert, Dr. Banks, and treating physicians, for information regarding Mr. Crittenden's medical condition.   Mr. Stephens stated that he could not quantify the curve of Mr. Crittenden's spinal column, but that his review of medical records and "taking a look at some of the imagery," informed his opinion.  (Stephens Dep. 12:13-23).   Mr. Blaisdell testified, "I think the photographs show what he had," arguing essentially that photographs were sufficient for him to diagnose Mr. Crittenden's supposed spinal condition.   (Blaisdell Dep. 83:15-22).   However, at his deposition, Mr.

Blaisdell could not even remember the *words* for the medical condition that he says caused Mr. Crittenden's injuries.  (*Id.* 20:4-12).

Ultimately, both Mr. Stephens and Mr. Blaisdell admit that they must rely on experts with medical and biomechanical training on the issues of injury mechanism and medicine.  (Stephens Dep.11:4-7, 41:6-17; Blaisdell Dep. 17:6-18:7).  Federal law is clear that attempting to provide expert opinion based on analysis performed by another expert is insufficient to allow admission under Rule 702.  *See, e.g., Eberli v. Cirrus Design Corp.,* 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) (rejecting an expert's opinion as unreliable because it merely adopted another expert's testing and conclusions and thus constituted impermissible parroting); *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d 609, 614 (7th Cir. 2002) ("The Daubert test must be applied with due regard for the specialization of modern science.  A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.  That would not be responsible science.").  Accordingly, Mr. Stephens and Mr. Blaisdell lack reliable, admissible facts and data supporting their opinions, and for this additional reason, they must be barred from offering any medical or biomechanical testimony regarding Mr. Crittenden's condition.

### *3. Mr. Stephens and Mr. Blaisdell failed to use reliable principles and methods to reach their conclusions regarding Mr. Crittenden's medical condition and injuries.*

In addition to being unqualified to offer medical or biomechanical opinions and having insufficient facts or data on which to base this opinion, Mr. Stephens and Mr. Blaisdell fail to utilize reliable principles and methods to support their opinions that Mr. Crittenden's injuries were caused by a pre-existing medical condition, not the collapse of the subject seat. As a result, they fail to meet the third requirement of Rule 702.

In *Cooper v. Marten Transport, Ltd.*, a biomechanical engineer sought to testify that a collision "would have been enough to damage the disc[s] or exacerbate a pre-existing lumbar degenerative disc," causing the plaintiffs' injuries. 539 F. App'x 963, 965 (11th Cir. 2013) (unpublished). The Eleventh Circuit Court of Appeals held that the district court did not abuse its discretion in excluding that testimony. *Id.* The court noted that, while the expert had "extensive experience in his field, his opinion in this case was not the product of a scientifically reliable methodology." *Id.* at 966. The court held that the expert's opinion in the case was not the result of any testing, nor did it reflect any consideration of alternative causes, and accordingly, amounted to "asking the district court simply to take the expert's word for it." *Id.* at 965-66 (quotation omitted).

Just like in *Cooper*, Mr. Stephens and Mr. Blaisdell fail to apply any reliable principles or methods to reach the conclusion that Mr. Crittenden's health condition caused his injuries in the subject accident. They both testified that they did not perform an accident reconstruction, nor did they do any testing that accounted for Mr. Crittenden's supposed spinal condition *or any alternative cause*. In fact, the only testing they performed for this litigation was to place a weighted block, not a dummy, in an exemplar seat, and then apply force to the seatback until it failed. Accordingly, while they blame Mr. Crittenden's spine for his injuries, Mr. Stephens and Mr. Blaisdell have done absolutely no testing or analysis to support that conclusion, nor do they have the medical or biomechanical background to do so.

Finally, because Mr. Stephens and Mr. Blaisdell have failed to meet Rule 702's requirements regarding qualifications, sufficient facts or data, and reliable principles and methods, they cannot show that they have applied any principles or methods reliably to the facts of this case, which is Rule 702's final requirement. *See, e.g., Morris*, 455 F. Supp. 2d at 1334. As a result, Mr. Stephens and Mr. Blaisdell must not be permitted to offer medical or biomechanical opinions regarding Mr. Crittenden's health condition to the jury.

**B.     Rule 702 requires the exclusion of Mr. Stephens's and Mr. Blaisdell's specific opinion that Plaintiffs' expert's alternative design would have posed "a special risk to Mr. Crittenden given his condition."**

Mr. Stephens and Mr. Blaisdell also lack the necessary qualifications, sufficient facts or data, or reliable principles and methods to support the specific opinion that the alternative seat design tested by Plaintiffs' expert, Mr. Meyer, would pose a "special risk" of injury to Mr. Crittenden because of his spinal condition.  For the same reasons in Part II-A, *supra*, Mr. Stephens and Mr. Blaisdell are entirely unqualified to offer medical or biomechanical opinions, nor do they have sufficient facts or data upon which they can base those opinions, other than by impermissibly parroting the opinions of Kia's biomechanical expert.  Nevertheless, Mr. Stephens and Mr. Blaisdell attempt to criticize Mr. Meyer's alternative design, stating that it would pose a special risk of injury to Mr. Crittenden because of a supposed spinal condition.  However, Mr. Stephens and Mr. Blaisdell admit that they are not qualified to identify or diagnose that condition, nor can they testify regarding the injury mechanism in the subject collision.  Even more importantly, Mr. Stephens and Mr. Blaisdell have done absolutely no testing and have no data in support of their conclusion that the alternative design seat would have posed a unique risk to Mr. Crittenden.  Essentially, they are asking this Court to take their word for it, a strategy explicitly rejected under federal law.  *See Kumho*, 526 U.S. at 157; *Morris*, 455 F. Supp. 2d at 1331.  Accordingly, and for those reasons set forth in Part II-A, Rule

702 bars any testimony from Mr. Stephens and Mr. Blaisdell that the alternative seat design posed a special risk to Mr. Crittenden due to his medical condition.

**C.     Mr. Stephens's and Mr. Blaisdell's testimony regarding testing unrelated to this litigation of dissimilar vehicles must be excluded.**

Plaintiffs anticipate that Kia will attempt to have Mr. Stephens and Mr. Blaisdell testify that, as compared to select seats from other passenger vehicles, the subject seat was "one of the strongest."  To support this opinion, Mr. Stephens and Mr. Blaisdell have included identical charts in their expert reports, which are excerpted above.  This information is both irrelevant and highly misleading to the instant case and the subject seat, as this data involves testing performed in other cases. not for this litigation, involving undisclosed underlying test data and dissimilar vehicles, and using test methods that do not reflect the forces involved in the subject collision.

A trial court assessing the reliability of an expert's evidence must perform a "gatekeeping" function by conducting "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Hendrix*, 609 F.3d at 1193 (quotation omitted).  "Courts are cautioned not to admit speculation, conjecture, or inference that cannot be supported by sound scientific principles."  *Id.* at 1194 (quoting *Rider v. Sandoz Pharms. Corp.*, 295 F.3d 1194, 1202 (11th Cir. 2002)).

In products liability cases, the Alabama Supreme Court has "consistently upheld the exclusion of evidence of a defect in other products where there had not been shown a substantial similarity of material circumstances." *Russell v. Sobel, Bernstein & Greene Co.*, 530 So. 2d 1369, 1370 (Ala. 1988). Thus, for example, where reports of other incidents specifically dealt with the allegedly defective component in engines *identical* to the plaintiff's engine, they were held to be admissible. *Gen. Motors Corp. v. Johnston*, 592 So. 2d 1054, 1059 (Ala. 1992). However, where the plaintiff sought to admit evidence of other allegedly similar incidents, where the reports dealt with the same vehicle as the plaintiff's but involved varying automotive malfunctions, the Alabama Supreme Court held that the trial court did not abuse its discretion in excluding those other incidents. *Taylor v. Gen. Motors Corp.*, 707 So. 2d 198, 203 (Ala. 1997). Similarly, in *Keller v. Goodyear Tire & Rubber Co.*, the Alabama Supreme Court held that the trial court properly refused to admit evidence of the failure of other tires of the same model tire, because the proponent failed to establish that the failures occurred "under substantially similar circumstances," and because the plaintiffs failed to show that "the failures were identical in nature" to the tire failure in that suit. 521 So. 2d 1312, 1314 (Ala. 1988).

Here, Mr. Stephens's and Mr. Blaisdell's opinion that the Kia seat is a "stronger than average" or "one of the strongest" seats available must be excluded

for numerous reasons.  First, the charts and underlying testing they use to support this opinion have not been derived from a scientifically valid reasoning or methodology.  *See Hendrix,* 609 F.3d at 1193.  Specifically, for figure 19, above, Stephens and Blaisdell are using published charts reflecting test results they did not even obtain or verify themselves, but is generally "available to the scientific community."  It is impossible to tell from the chart what vehicles were tested, what vehicles were *not* tested, whether any test results were excluded, which seats in the vehicle were tested, and by whom they were tested.

Moreover, for figures 20a and 20b, above, reflecting vehicles tested by the engineering firm CRA, Mr. Stephens and Mr. Blaisdell admit that they did not even personally perform or analyze all of the tests reflected in those charts.  (Stephens Dep. 76:12-78:14; Blaisdell Dep. 45:7-14).  They could not testify as to whether passenger or driver seats were being tested for each vehicle on the chart, nor could they state with certainty that all the vehicles their engineering firm had ever tested were reflected on the charts, or whether some results were not included.  (Blaisdell 46:18-47:16).

Even more importantly, Mr. Blaisdell admitted that the "strength" number reflected in the chart *does not inform how a seat is going to perform in a real-world collision*.  (*Id.* 53:3-6).  In fact, even though the seats are "ranked" by their results on the push-to-failure test, Mr. Stephens could not testify based on looking at the

charts or the strength number reflected in the chart *whether any of the seats on the chart were determined to be defective*.  (Stephens Dep. 76:12-78:14).  In fact, Mr. Blaisdell testified that a higher strength number does not necessarily mean the seat is actually safer for the occupant, stating "It depends primarily, I think, on the condition of the occupant."  (Blaisdell Dep. 60:9-13).  Nevertheless, Mr. Stephens and Mr. Blaisdell intend to use these strength numbers to rank seats and testify to the jury that the subject seat is an above-average seat and one of the strongest they have ever tested. This demonstrates highly flawed methodology and unsupported reasoning that would be flatly rejected by the scientific community, and it must be rejected by this Court.

Moreover, even if Mr. Stephens and Mr. Blaisdell had derived their charts using sound reasoning and methodology, their opinions and supporting charts must be barred from evidence for being dissimilar to the underlying incident.  Alabama law requires a showing of "substantial similarity of material circumstances" before evidence of other incidents can be admitted, including a showing of identical products and substantially similar conditions.  *See Russell*, 530 So. 2d at 1370.  The tests reflected in Mr. Stephens's and Mr. Blaisdell's opinions and charts are entirely dissimilar in all important respects.  First, the charts reflect the results of block, push-to-failure tests, a testing that does not even attempt to recreate the material circumstances of the subject vehicle collision, such as the forces involved in the

accident sequence.  Second, the charts reflect the results of numerous dissimilar vehicles to the subject vehicle, including pick-up trucks, sports cars, sedans, and SUVs.  Alabama law clearly bars the admission of such dissimilar evidence in the products liability context.

In addition to being inadmissible due to the dissimilarity of the underlying vehicles to the subject vehicle, and the differences between the testing scenarios to the subject accident sequence, the purported analysis is also inadmissible due to the lack of relevance.  In federal court, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence[,] and [ ] the fact is of consequence in determining the action."  Fed. R. Evid. 401.  Irrelevant evidence is not admissible.  Fed. R. Evid. 402.  The *Daubert* court described this relevance requirement as one of "fit"—an expert's opinion must be scientifically related to the issues to be considered helpful to the jury.  509 U.S. at 591, 113 S. Ct. at 2796.

Here, the test results reflected in Mr. Stephens's and Mr. Blaisdell's charts are irrelevant.  They do not inform the jury regarding the performance of the subject seat in a real-world accident, as acknowledged by Mr. Blaisdell.  (Blaisdell Dep. 53:3-6).  They do not inform the jury regarding the subject seat or the subject vehicle, as the testing is of dissimilar vehicles with different seats, not the vehicle or the seat at issue in this case.  They do not inform the jury regarding the subject collision, as the

test results were performed pursuant to a static push-to-failure test that does not mimic the forces in the subject rear-end collision.  And most importantly, as Stephens and Blaisdell testified, the resulting inch-pounds strength number does not even provide information as to whether a seat was defective.

As a result, these selected test results and the charts reflecting those results (Figures 19, 20a, and 20b) plainly do not "fit" to answer the questions at issue—was the subject seat defective and were there available, alternative designs that would have prevented Mr. Crittenden's injury?  Ultimately, because these collected test results don't answer any of these questions, and indeed, do not provide any information regarding what makes a vehicle "defective," or about the subject vehicle or collision at all, they are irrelevant.  The selected testing depicted in these charts does not "fit" the issues in this case pursuant to *Daubert*, and any expert opinions using or pointing to these tests or the charts Mr. Stephens and Mr. Blaisdell created should be excluded.

### III.  CONCLUSION

Plaintiffs respectfully request this Court grant their motion to exclude specific areas of testimony by Mr. Stephens and Mr. Blaisdell, and specifically for an Order barring them from testifying regarding:

(1)     any medical or biomechanical opinions, and specifically, the opinion that Mr. Crittenden's pre-existing health condition caused the injuries he suffered in the subject collision;

(2)     the opinion that Plaintiffs' expert's alternative seat design would have posed a special or elevated risk to Mr. Crittenden due to a pre-existing health condition; and

(3)     the opinion that the subject seat is one of the strongest or an above average seat based on the charts depicted above, labeled Figures 19, 20a, and 20b,[8] as well as any use of or reference to those charts.


Respectfully submitted this 11th day of July, 2018.

 /s/ Jeffrey R. Harris
JEFFREY R. HARRIS
*Admitted Pro Hac Vice*
Georgia Bar No. 330315
YVONNE S. GODFREY
*Admitted Pro Hac Vice*
Georgia Bar No. 318567
**HARRIS LOWRY MANTON LLP**
410 E. Broughton St.
Savannah, Georgia 31401
Telephone: (912) 651-9967
Facsimile: (912) 651-1276
Email: Jeff@hlmlawfirm.com
Email: Yvonne@hlmlawfirm.com

---

[8] The identical charts appearing in Mr. Blaisdell's expert report as Figures 9, 10a, and 10b must also be excluded.

CHRISTOPHER A. KEITH
(Alabama Bar No.:ASB-6728-O76K)
**WETTERMARK KEITH, LLC**
3595 Grandview Parkway, St. 350
Birmingham, Alabama 35253
Telephone: (205) 933-9500
Facsimile: (205) 977-3431
Email: chris@wkfirm.com

REBECCA FRANKLIN HARRIS
*Admitted Pro Hac Vice*
Georgia Bar No. 141350
**FRANKLIN LAW LLC**
1201 Peachtree St., NE, Suite 900
Atlanta, Georgia 30361
Telephone: (404) 961-5333
Facsimile: (404) 969-4503
Email:rebecca@franklinlawllc.com

***Attorneys for Plaintiffs***

## **CERTIFICATE OF SERVICE**

I hereby certify that I have either electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to those attorneys registered, and/or I have forwarded by e-mail or placed a copy of the foregoing to the attorneys as follows in the United States Mail, postage prepaid and properly addressed on this 11th day of July, 2018.

De Martenson, Esq.
DMartenson@huielaw.com
J. Patrick Strubel, Esq.
PStrubel@huielaw.com
Huie, Fernanbucq & Stewart, LLP
Three Protective Center
2801 Highway 280 South, Suite 200
Birmingham, AL 35223-2484
*Attorneys for Kia Motors Corporation,*
*Kia Motors America, Inc.  and*
*Hyundai America Technical Center, Inc.*

/s/ Jeffrey R. Harris
JEFFREY R. HARRIS
*Admitted Pro Hac Vice*
Georgia Bar No. 330315
YVONNE S. GODFREY
*Admitted Pro Hac Vice*
Georgia Bar No. 318567
**HARRIS LOWRY MANTON LLP**
410 E. Broughton St.
Savannah, Georgia 31401
Telephone: (912) 651-9967
Facsimile: (912) 651-1276
Email: Jeff@hlmlawfirm.com
Email: Yvonne@hlmlawfirm.com