Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

FILED
2018 Jul-11 PM 01:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA


| | |
|---|---|
| JOHN DANIEL CRITTENDEN and DENISE MCGOUGH CRITTENDEN, | ) ) ) |
| Plaintiffs, | ) ) No. |
| vs. | ) 2:16-cv-01712-KOB ) |
| KIA MOTORS CORPORATION, KIA MOTORS AMERICA, INC., HYUNDAI AMERICA TECHNICAL CENTER, INC., and ABC, DEF and/or GHI, being those persons, firms, corporations, or entities that designed, manufactured, engineered, marketed, sold, installed, and/or otherwise placed into the stream of commerce the front seat assembly and/or its component parts, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |


VIDEOTAPED DEPOSITION OF GREGORY D. STEPHENS

January 26, 2018

Tacoma, Washington


Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square          2208 North 30th Street, Suite 202
600 University St.        Tacoma, WA 98403
Suite 2300               (253) 627-6401
Seattle, WA 98101        (253) 383-4884 Fax
(206) 340-1316           scheduling@byersanderson.com
(800) 649-2034           www.byersanderson.com


Serving Washington's Legal Community Since 1980

Exhibit A

APPEARANCES

For the Plaintiffs:

Rebecca Franklin Harris
Franklin Law
1201 Peachtree Street N.E.
Suite 900
Atlanta, GA 30361
404-961-5333
404-969-4503 Fax
rebecca@franklinlawllc.com

For the Defendants:

De Martenson
Jeremy Gaddy (via telephone)
Huie Fernambucq & Stewart
2801 Hwy 280 S.
Suite 200
Birmingham, AL 35223
205-297-8843
205-251-1256 Fax
dmartenson@huielaw.com

Also present: Cody Malone
Videographer, Byers & Anderson, Inc.
Court Reporters & Video

Page 2

---

EXAMINATION INDEX

EXAMINATION BY:                              PAGE NO.
MS. HARRIS                                        6

EXHIBIT INDEX

EXHIBIT NO.     DESCRIPTION              PAGE NO.
Exhibit No. 21   8-page Notice of Deposition      6
Exhibit No. 22   17-page Crittenden Report,       7
                 12/18/17

Exhibit No. 23   13-page Yielding Seat Info.     45

Exhibit No. 24   23 pages Billing GDS            57

Exhibit No. 25   8 DVDs Vehicle/Seat            57
                 Inspections
Exhibit No. 26   84-page G. Stephens Report      57
                 Material

Exhibit No. 27   553 pages Seat Reference        57
                 Material Volume 1
Exhibit No. 28   571 pages Seat Reference        58
                 Material Volume 2

Exhibit No. 29   419 pages Seat Reference        58
                 Material Volume 3
Exhibit No. 30   453 pages Seat Reference        58
                 Material Volume 4

Exhibit No. 31   340 pages Crittenden v. Kia      87
                 CRA Inspections
Exhibit No. 32   4-page Index of Disc. 1 KMC     112
                 DOC Production

Exhibit No. 33   73 pages Duplicate              113
                 Correspondence File

Page 3

---

EXHIBIT INDEX (Continued)

EXHIBIT NO.     DESCRIPTION              PAGE NO.

Exhibit No. 34   1-page Index of Disc 1 Def.      114
                 KMC DOC Production
Exhibit No. 35   15-page Subject Vehicle Tahoe    115
                 Files

Exhibit No. 36   19-page Subject Vehicle Kia      115
                 Files
Exhibit No. 37   71-page Crittenden v. Kia        115
                 Investigative File

Exhibit No. 38   78 pages copies of photos        115
                 produced by Plaintiff
Exhibit No. 39   10 pages Kia Seat Photos from    116
                 Crash

Exhibit No. 40   45-page NHTSA Head Restraint     116
                 File
Exhibit No. 41   49 pages Dummy Info              117
Exhibit No. 42   11-page Kia Test Pulse           117
                 Comparison

Exhibit No. 43   58-page Faro Data                118

Exhibit No. 44   19-page IIHS Info                118

Exhibit No. 45   2-page Curriculum Vitae          119

Exhibit No. 46   1-page Deposition and Trial      120
                 Testimony
Exhibit No. 47   8-page OOP Images                123
Exhibit No. 48   14-page Position in Seat         125
                 Photos

Exhibit No. 49   4-page NHTSA Docket 89-20        128
                 Volume 1
Exhibit No. 50   4-page NHTSA Docket 89-20        129
                 Volume 2

Page 4

---

BE IT REMEMBERED that on Friday,
January 26, 2018, at 2208 North 30th Street, Tacoma,
Washington, at 12:38 p.m., before Christy Sheppard,
Certified Court Reporter, CCR, RPR, appeared GREGORY D.
STEPHENS, the witness herein;

WHEREUPON, the following proceedings
were had, to wit:

<<<<<< >>>>>>

THE VIDEOGRAPHER: Good afternoon. We
are now on the record. The time is 12:38 p.m. Today is
Friday the 26th day of January 2018.

This is the video recorded testimony of Gregory
Stephens being taken in the case of Crittenden versus Kia
Motors Corporation, et al. The cause number of
2:16-cv-01712.

The deposition is taking place in North 30th Street
in Tacoma, Washington. At this time we would ask the
counsel present to state whom they represent.

MS. HARRIS: Rebecca Harris on behalf
of the plaintiffs.

MR. MARTENSON: De Martenson, Jeremy
Gaddy for the Kia defendants.

Page 5

Seattle/Tacoma, Washington

**Page 6**

1    THE VIDEOGRAPHER:  Thank you.  At this
2  time we would ask our court reporter, Christy Sheppard,
3  to please swear in the witness and proceed.
4
5
6    GREGORY D. STEPHENS,   having been first duly sworn
7         by the Certified Court Reporter,
8         testified as follows:
9
10
11    EXAMINATION
12  BY MS. HARRIS:
13  Q  Please state your full name, Mr. Stephens.
14  A  Gregory D. Stephens, S-T-E-P-H-E-N-S.
15  Q  All right.  Mr. Stephens, you sat through the deposition
16  of Mr. Blaisdell this morning, correct?
17  A  Yes, ma'am.
18  Q  Okay.  And it appears to me that you guys shared a
19  majority of your file, right?
20  A  It was one -- it's basically one file, yes, ma'am.
21  Q  Right.  And so we have marked up through -- we marked 20
22  exhibits to his deposition, so at any point in time you
23  want to refer to those, please do so.
24  A  I appreciate that.
25    (Exhibit No. 21 marked

**Page 7**

1    for identification.)
2
3  Q  Okay.  I have marked as Exhibit 21 the notice of your
4  deposition.  Have you seen that?
5  A  Yes, ma'am.
6  Q  And I am marking as 22 your report.
7    (Exhibit No. 22 marked
8    for identification.)
9
10  Q  Just make sure that's your report, the final report, if
11  you will.
12  A  Yes, ma'am.
13  Q  Okay.  And I understand you do not have an index of your
14  file anywhere?
15  A  That's -- well, certainly not here.  I mean, obviously we
16  have stuff back at the office that the administrative
17  people take care of but nothing that we have here.
18  Q  Do they have an index of your entire file, for example,
19  all these little folders?
20  A  I don't believe so.  They will normally kind of log in
21  stuff that gets received, but we normally will print it
22  out or make some sort of a record of it this way.
23  Q  Okay.  All right.  So based on your report, it's my
24  understanding that you have been asked by Kia to evaluate
25  the crash performance of the subject Kia Sportage, right?

**Page 8**

1  A  In terms of its driver seating system and the facts and
2  circumstances of the accident as they relate to them.
3  Q  Okay.  Would it be fair to categorize your opinions as --
4  you intend to offer defect opinions?
5  A  I would think that that falls under that as well as, you
6  know, just the overall performance and evaluation of some
7  of the materials that have been provided to us.
8  Q  Okay.  Now I understand you have done a number of
9  accident reconstructions in the past, right?
10  A  Yes, ma'am.
11  Q  Did you do an independent accident reconstruction in this
12  case?
13  A  I did not.
14  Q  You are relying on Mr. Hoover for the accident recon?
15  A  I would say certainly most of it.  I have certainly had a
16  chance, as you recall, over at Weil Wrecker to inspect
17  the Tahoe in addition to the Sportage.
18  Q  Right.
19  A  So obviously I have some opinions that may overlap on his
20  as it relates to the offset nature, but I would, for the
21  most part, agree with what he's done thus far.
22  Q  Okay.  Did you visit the scene when you were -- well,
23  when you were at Weil's?
24  A  Certainly not as it relates to this accident or this
25  case.

**Page 9**

1  Q  Have you been to the scene of the accident?
2  A  I believe I have been through there a number of times.
3  Q  On your way to Weil's?
4  A  No.  If I remember the location, it would just be kind of
5  on my way to the outskirts of Alabama.
6  Q  Okay.  Did you ever inspect the scene for purposes of
7  this case?
8  A  No.
9  Q  Do you have any additional accident recon opinions to add
10  to what Mr. Hoover testified to on Tuesday of this week?
11  A  I don't believe so.  Certainly not as it would relate to
12  the reconstruction.
13  Q  Okay.  And would you agree that Mr. Hoover's
14  reconstruction is very similar to Mr. Kennett's, the
15  plaintiff's accident recon expert?
16    MR. MARTENSON:  Object to form.
17    THE WITNESS:  I have not done that
18  analysis, so I haven't done a comparative type of
19  analysis to identify that information for you.
20  Q  (By Ms. Harris)  Okay.  Are you -- do you intend to
21  criticize any of Mr. Kennett's work with respect to
22  accident reconstruction in this case?
23    MR. MARTENSON:  Object to the form.
24    THE WITNESS:  None that I have studied
25  to this point, at least as it relates to the

3 (Pages 6 to 9)

**Page 10**

1   reconstruction.
2   Q   (By Ms. Harris)  In other words, do you intend to offer
3   opinions about, you know, whether his Delta-V is correct,
4   or the crash pulse, or anything like that?
5   A   Obviously, we will have to see what's testified to at
6   trial, so if there's any new information that comes up,
7   but as to the work done today, I have not formed any of
8   that opinion.
9   Q   Do you intend to offer any opinions with respect to human
10  factors or warnings?
11  A   I don't believe so.
12  Q   Okay.  Occupant kinematics?
13  A   Certainly as it relates to the seat back performance
14  similar to what Mr. Blaisdell had talked about a little
15  bit.
16  Q   Okay.  So you intend to offer opinions about how Mr.
17  Crittenden moved in the seat during the accident
18  sequence?
19  A   Only as it relates to the seat back performance.
20  Q   Well, what other occupant kinematics would you -- would
21  there be involved?
22  A   I think I would defer to the specifics of Mr. Crittenden
23  and portions of his body interacting with things to Dr.
24  Banks.  And I would relate the kinematics, in general, as
25  an occupant, Mr. Crittenden in this particular case,

**Page 11**

1   interacting with his seat and the deformation that I've
2   evaluated and analyzed as it relates to the performance
3   of the seat.
4   Q   Okay.  So what I am hearing you say, correct me if I'm
5   wrong, you intend to leave the injury mechanism to Dr.
6   Banks?
7   A   For sure, yes, sir, or ma'am.  Pardon me.
8   Q   That's fine.  And obviously you intend to -- well, do you
9   intend to defer to Dr. Banks on any preexisting medical
10  conditions that Mr. Crittenden may have had?
11  A   Well, certainly I have reviewed all of the available
12  information on that which includes the two doctors, or
13  the three doctors I should say, which includes Dr. Banks
14  of your question, but I have -- I'm working with that
15  understanding as it relates to the performance, meaning
16  his preimpact condition explains some of the damage and
17  performance of the seat that I have observed.
18  Q   But you are relying on others to -- for the opinions, the
19  medical opinions related to his preimpact condition?
20  A   Certainly there's some of that, but obviously I have read
21  and reviewed some of the information that I would say in
22  particular Dr. Sullivan has talked about, and some of the
23  information that he's talked about, but I think as you
24  pointed out earlier, I'm not a -- Mr. Blaisdell and
25  myself are not radiologists, but we did take a look at

**Page 12**

1   some of that information as it relates to how he would be
2   positioned in the seat.
3   Q   Okay.  And maybe my question was badly worded.  Do you
4   intend to rely upon Dr. Banks and Mr. Crittenden's
5   treating physicians, and any other expert that testifies
6   in this case, with respect to Mr. Crittenden's medical
7   condition prior to the accident?
8   A   I would certainly defer to them on the specifics of it,
9   but working under the understanding of his spinal
10  condition in terms of how it would posture him in the
11  seat is effectively what I'm using in my seat back
12  evaluation.
13  Q   Do you have any understanding of his spinal condition
14  other than what you have read from Dr. Banks or learned
15  from Dr. Banks and his treating physicians?
16  A   I would think the only other information would be what I
17  have seen in terms of some of the medical records.
18  Obviously, I didn't review them with the type of
19  information that the doctors, the treating doctors and
20  Dr. Banks have taken a look at it.  But, you know, in
21  taking a look at some of the imagery, it certainly has
22  some -- gives me some understanding of how his spine
23  would interact with the seat structure.
24  Q   Okay.  You are not a medical doctor?
25  A   Absolutely not.

**Page 13**

1   Q   Okay.  Did you go to medical school?
2   A   No, I didn't.
3   Q   All right.  Do you examine patients on a regular basis?
4   A   No.
5   Q   Have you ever diagnosed a patient with any spinal
6   condition?
7   A   No, ma'am.
8   Q   Okay.  Have you ever read any imaging studies or films
9   with respect to the spine as part of diagnosing a
10  patient?
11  A   No, ma'am.
12  Q   Do you have any formal medical training?
13  A   Not as I'm understanding your question.
14  Q   Okay.  Have you ever been qualified in a court of law to
15  offer medical opinions?
16  A   Again, not as I'm understanding your question.
17  Q   Okay.  And I think you said this, but you intend to
18  consider all medical testimony that we get from now until
19  trial, and even that that may come during trial, correct?
20  A   I certainly will consider everything that comes up after
21  this deposition, if that's what you are asking.
22  Q   Right.  You are not going to ignore certain doctors and
23  believe others, right?
24  A   Again, I will look at everything.  I have no idea what's
25  going to come out, but I will look at everything.

**Page 14**

1  Q  All right. Do you intend to offer any statistical
2  opinions in this case?
3  A  Again, depends on how you interpret that, but obviously I
4  consider this a pretty severe accident, and that in some
5  respects refers back to at least some form of statistics.
6  Q  Other than accident severity, what other categories of
7  statistical information or opinions do you intend to
8  offer?
9  A  I think generally as far as evaluating seat performance,
10  we oftentimes refer to the fact that the seats are
11  essentially doing a good job, and that is shown in the
12  statistical findings on most accidents out there.
13  Q  Okay. Do you consider yourself an expert in statistics?
14  A  Again, certainly as it relates to taking a look at them
15  from an accident reconstruction and, you know, perhaps
16  severity standpoint, but I would think that statisticians
17  sometimes would take a little offense to that.
18  Q  So would the doctors if you are going to offer medical
19  opinions.
20      Have you ever been qualified in a court of law in
21  the are of statistics?
22  A  I have certainly used them. And, again, I would consider
23  my utilization of them as more or less taking the
24  information that has been researched and published as
25  opposed to performing it.

**Page 15**

1  Q  I'm sorry. I didn't understand. I understood you up
2  until the last clause, as opposed to performing it? What
3  do you mean?
4  A  Performing statistical type studies. In other words, I
5  don't know that I've actually performed a statistical
6  like study, taking into account everything that goes into
7  that. However, I rely on them pretty regularly.
8  Q  Okay. Understand. You haven't done a statistical
9  analysis specific for this case?
10  A  Correct.
11  Q  All right. You also say in your report that you were
12  asked to respond to claims made by plaintiff's experts.
13  Experts -- obviously you are going to respond to Mr.
14  Meyer's opinions and I just asked you with respect to Mr.
15  Kennett's opinions, but I want to include all of his
16  opinions. Do you intend to respond to any of Mr.
17  Kennett's opinions?
18  A  Well, I think some of it, as far as the seat back
19  evaluation, does in fact respond to Mr. Kennett's
20  opinions, so, yes, I think there is some responses to Mr.
21  Kennett.
22  Q  What about his biomechanical opinions?
23  A  Again, depends on what you define as biomechanical, but
24  if you are including in that the movement of Mr.
25  Crittenden relative to the seat back, I would say yes.

**Page 16**

1  Q  Okay. What about injury mechanism or in other words, how
2  he received his injury?
3  A  I would defer mainly to Dr. Banks on that, other than my
4  understanding of the injury mechanism.
5  Q  Other than your understanding of the injury mechanism
6  from the medical records?
7  A  No, from Dr. Banks.
8  Q  From Dr. Banks, okay.
9  A  Sorry.
10  Q  All right. In your report you go through the things that
11  you have reviewed, I believe, on Page 2. Well, starting
12  on Page 1. There are a couple depositions that I believe
13  have been taken since you finalized your report, so under
14  No. 7, what other depositions have you read? I'm sorry,
15  No. 8.
16  A  Yes, No. 8, I believe, and I can list them off if you
17  would like.
18  Q  Sure.
19  A  Taylor Gunnells, G-U-N-N-E-L-L-S, Todd Hoover, Kelly
20  Kennett, Kim -- or I should say Bongku Kim, B-O-N-G-K-U,
21  Kim, John McDaniel, Steve Meyer, M-E-Y-E-R, and I believe
22  Dr. Joseph Sullivan, S-U-L-L-I-V-A-N, the III, I think.
23  Q  In reviewing depositions in this case, did you ask to
24  review the deposition of the driver of either vehicle?
25  A  I believe I asked for, you know, whatever was available

**Page 17**

1  just in general.
2  Q  Did you specifically ask for the drivers' depositions?
3  A  I don't know that I specifically asked for them, but I
4  asked for all depositions that had been taken.
5  Q  Did you question why there weren't depositions of either
6  driver?
7  A  No.
8  Q  Okay. That didn't give you any pause?
9  A  Well, other than the pause of I thought they were missing
10  because oftentimes we have depositions, but other than
11  that.
12  Q  Okay. We have gone through -- well, you list everything
13  that you have reviewed. Tell me everything else that you
14  have done in preparation for offering your opinions.
15  Q  Just in general?
16  Q  Well, obviously you inspected the vehicles, right?
17  A  Yes, ma'am.
18  Q  And you did -- you and Mr. Meyer did a de-trim, correct?
19  A  Yes, ma'am.
20  Q  And you reviewed documents that are listed in here,
21  right?
22  A  Yes, ma'am.
23  Q  Okay. What about meetings with other experts, tell me
24  about meetings.
25  A  I don't recall any. I seem to recall that there was one

Page 18

1    but I was not available at the time.
2  Q  Okay.  Well, when was that?
3  A  I thought Mr. Blaisdell had indicated that it was
4    somewhere in October.  I would have to look at his
5    records.
6  Q  Okay.  And that was a WebEx meeting or something?
7  A  I don't know.  I apologize.
8  Q  Well, you have obviously conferred with Mr. Blaisdell in
9    this case?
10  A  Yes, ma'am.
11  Q  Have you talken -- have you talken?
12    Have you talked to Dr. Banks about this case?
13  A  I believe so.
14  Q  Okay.  When was that?
15  A  I thought it was sometime in either November or December.
16  Q  Okay.  Do any of your records that you have with you
17    reflect that?
18  A  I don't know.  I could check my billings, but I don't
19    know.
20  Q  If you don't mind taking a look at your billings.
21  A  Okay.  Want me to look?
22  Q  Yeah, we don't need to go off the record.  You can just
23    take a look for them.
24  A  I don't believe it says in here.  I have time entries
25    that go up through October and November but not into

Page 19

1    December, so -- and, again, I don't know that I normally
2    point out who I'm talking to.
3  Q  Okay.  But it's your recollection that you had a phone
4    call with Dr. Banks in either October or November?
5  A  I don't -- I seem to recall phone calls with Mr.
6    Martenson, but I don't know, as I sit here, if it also
7    included Dr. Banks.  I think it would have to because I
8    recall talking at some point in time to him about this.
9  Q  Okay.  Do you recall how many phone calls you had when
10    Dr. Banks was on the line?
11  A  All I can recall, at this point in time, is maybe one.
12  Q  Okay.  And was Mr. Martenson on the phone for all of
13    those?
14  A  I don't know.  I apologize.
15  Q  All right.  When you talked to Dr. Banks in October or
16    November, had you formed your opinions with respect to
17    the design defect or lack thereof at that time?
18  A  I don't recall any.  I recall talking about how we were
19    starting to understand the seat back performance in terms
20    of its deformation relative to what Mr. Meyer had done.
21    And, again, I don't know if that was necessarily with Dr.
22    Banks or Mr. Martenson.
23  Q  Well, what I'm asking is, had you formed your opinions
24    about the defect or lack thereof when you spoke -- the
25    first time you spoke with Dr. Banks?

Page 20

1  A  I don't recall.
2  Q  Okay.  Do you know when you formulated your opinions with
3    respect to the design?
4  A  Well, certainly that's an evolving process over the case.
5    I was retained -- I can tell you at least the time frame,
6    back in November of 2016, and my report was finalized in
7    late December, so I would think that that's an evolving
8    process that -- in terms of the analysis of the seat and
9    the seat system.
10  Q  Did you have an opinion about the safety of the seat
11    system when you inspected the vehicle for the first time
12    I think it was last February or something?
13  A  I seem to recall taking a look at that, and at that point
14    in time I don't recall that we were able to move the
15    seat, again, because we were not with Mr. Meyer.  And I
16    forget if you were there.  I apologize, but I knew that
17    there was going to be at least some form of a de-trim
18    afterwards which would help in my understanding of how
19    the seat performed.
20  Q  Okay.  So at that point you didn't really have any seat
21    performance opinions?
22  A  I mean, other than the fact that, you know, the crash and
23    its severity looked pretty consistent with what I would
24    understand the seat to have deformed at.  And, again,
25    that's coming from my reconstruction background.

Page 21

1  Q  All right.  Did you review any medical records before
2    speaking with Dr. Banks?
3  A  I don't think so.  I have no memory of that.
4  Q  Okay.  So did you have an opinion that the seat was not
5    defectively designed before you had an understanding of
6    Mr. Crittenden's medical condition?
7  A  Again, I don't know that I had that understanding at all,
8    in terms of reviewing that prior to his condition.
9  Q  Right.  So without an understanding of his condition, did
10    you have an opinion about whether the seat was defective?
11  A  I don't know that I had formulated that.  And I'm trying
12    to remember the timing of when I started to find out
13    about his condition.  But if memory has it, it would be
14    sometime in October/November as far as I started to
15    understand his condition.
16  Q  Okay.
17  A  By that time, I think as you are aware, I had had a
18    chance with Mr. Meyer to de-trim the seat and have an
19    understanding of at least the deformation of the seat.
20  Q  Right.  So you understood how the seat performed, but it
21    wasn't until you gained some understanding of his medical
22    condition that you formed your ultimate opinion that the
23    seat was not defective?
24  A  No, not necessarily.  No, obviously once you have a
25    chance to see the seat in terms of its damage and how it

1 performed, then it becomes an understanding of what kind
2 of energies and movements are involved to get to that
3 type of damage and deformation. Also having an
4 understanding of what type of testing was performed on
5 it, those all kind of go into an evaluation.
6 Q Okay. So absent any understanding of his condition, you
7 could offer an opinion the seat wasn't defective?
8 MR. MARTENSON: Object to the form.
9 THE WITNESS: I think from a seat
10 performance standpoint and how it performed, one of the
11 things that we looked at is whether all the structures
12 are involved in the deformation, if there's any irregular
13 information. And I think one of the questions that we
14 had in looking at the seat deformation was why it might
15 have been twisted the way it was. Which, again,
16 ultimately, starts to come back to again his either
17 preimpact positioning, either by medical or by his own
18 self-positioning or some facet of the reconstruction.
19 Q Okay. So I will try it again.
20    Do you need to have an understanding of -- let's
21 just refer to your report. That might be easier for me.
22 Let's go to Page 3, the first paragraph.
23 A Yes, ma'am.
24 Q Okay. You describe this condition that we have been
25 talking about, correct?

Page 22

1 A Yes, ma'am.
2 Q All right. And you say "According to Dr. Banks," right?
3 A Yes, ma'am.
4 Q Okay. So based on what Dr. Banks has told you, or you
5 read from his report, you describe a medical condition as
6 what?
7 A Had an exaggerated curve in his spinal column in both the
8 forward and lateral direction.
9 Q Okay.
10 A As well as being fused effectively from T2 to L2.
11 Q And the fused language, is that something you determined
12 on your own?
13 A No.
14 Q That came from Dr. Banks?
15 A Well, it came from a review of Dr. Banks as well as the
16 treating and other doctor involved.
17 Q And the exaggerated curve of his spinal column, can you
18 quantify that?
19 A I can't. I would defer to Dr. Banks on that and others.
20 Q Do you need to know how exaggerated the curve of his
21 spinal column is in order to understand how occupant
22 kinematics worked in this case?
23 A Certainly that would come out in the analysis of it, but
24 I think your question was upon observing the damage to
25 the seat, did you need to know that for that, and I don't

Page 23

1 think so at that time. I just knew that it was a little
2 asymmetric, and it would be some form of an out of
3 position type damage, or something about the
4 reconstruction that dictated that.
5 Q Okay. So when you talk about the lateral curvature of
6 the spine, you are talking about scoliosis; is that
7 right?
8 A I would defer to Dr. Banks on exactly what it was, but in
9 his report he has a diagram -- or a couple of diagrams of
10 the spine, and it has from, as you are looking at me, a
11 curvature associated with it. And then, if you were
12 to look at me from the side view, it has kind of a
13 forward curvature associated with it.
14 Q Right. And I'm talking about sort of the side curvature.
15 A The lateral?
16 Q That's what you are relying on for your opinion that he
17 was out of position?
18 MR. MARTENSON: Object to the form.
19 Misstates the prior testimony.
20 Q (By Ms. Harris) Go ahead.
21 A I would say that in combination with the idea that he may
22 have been out of position purposefully.
23 Q Okay. Do you believe he was out of position
24 purposefully?
25 A Well, it's either that and/or the condition that are

Page 24

1 driving it.
2 Q Do you know whether he was out of position purposefully?
3 A Again, I would defer to Dr. Banks on the medical
4 condition with regard to the seat damage. There's more
5 damage, as you are aware of, on the outboard side of the
6 seat which would indicate he might have been positioned
7 over towards the left of the seat.
8 Q Any other evidence besides the damage to the seat that
9 would suggest he was out of position?
10 A Again, I would just defer back to the medical records.
11 Q Okay. Any testimony from anybody?
12 A Not to my knowledge, in terms of a pre-impact condition.
13 Q All right. And so, again, you can't quantify the
14 curvature of the spine to the side which may have put him
15 out of position?
16 A I would defer to Dr. Banks on that.
17 Q Okay. Let's go through your summaries of your opinions.
18 Your first opinion.
19 A Last page?
20 Q Last page, yes.
21 A Thank you.
22 Q First opinion that's under summary, you say that the Kia
23 Sportage is not defective or unreasonably dangerous.
24    What is your definition of defective?
25 A Well, again, as it relates to this seating system,

Page 25

7 (Pages 22 to 25)

Page 26

1 obviously, we have looked at a lot of information as it
2 relates to its strength, its energy management, its
3 dynamic performance. And I would say that everything
4 that we have in there, given it's state of the art, is
5 above and beyond what I have seen in terms of performance
6 from, I guess, the available data.
7 And so I would tend to consider that to be a well
8 understood seat system, and a seat system that provides a
9 lot of energy absorption.
10 Q I'm not asking about the seat. I'm asking -- you used
11 the term "not defective." What is your definition of
12 defective?
13 MR. MARTENSON: Object to form. Asked
14 and answered. You may go ahead again.
15 THE WITNESS: I apologize.
16 MS. HARRIS: De, I would ask that you
17 quit making speaking objections. They are not allowed
18 under the rules and you know that. You are coaching.
19 During the Blaisdell deposition it didn't matter. But if
20 he answers, "I just answered that," because you have
21 completely coached him. That is the first warning.
22 Please don't make speaking objections.
23 MR. MARTENSON: And the record will
24 reflect, madam, that that's not a speaking objection. It
25 was making a specific objection and there was no speaking

Page 27

1 objection to it, so please don't feel that you have to
2 tell me what to do.
3 Q (By Ms. Harris) Do you need the question?
4 A I don't think so.
5 Q Go ahead.
6 A I will do my best. I apologize.
7 Q It's an easy one. What is defective? How do you define
8 defective?
9 MR. MARTENSON: Same objection.
10 THE WITNESS: You know, as to the
11 nature of the defect as it relates to seat system
12 performance, obviously there's many different things that
13 go into that as far as circumstances that individual
14 accidents will encounter or not encounter, as far as an
15 evaluation.
16 But certainly in a general kind of global sense,
17 obviously if something is performing in a manner that is
18 unexpected and is not providing the benefit and the
19 design that it was intended, you start to question the
20 idea of whether or not it's a defective type of
21 condition.
22 And obviously the government has various definitions
23 of what is considered defective that go into that.
24 Q Okay.
25 A As well as the manufacturers. I apologize.

Page 28

1 Q Yeah, I don't mean to cut you off. Are you done?
2 A Yes, I think so.
3 Q So the Stephens definition of defective in this context
4 is a vehicle or a seat that's not performing in a
5 manner -- excuse me. Strike that.
6 Your definition is a seat that's performing in a
7 manner that is not protecting the occupant or unexpected?
8 A No, not necessarily. It's a question that is essentially
9 performing in a manner that is not designed or intended
10 in some respects as it relates to whatever you are
11 evaluating.
12 And that's why to almost a certain extent it depends
13 on the condition to which you are asking.
14 Q Do you have an understanding of the difference between a
15 design defect and a manufacturing defect?
16 A I have probably a rudimentary understanding.
17 Q Okay. What is your understanding?
18 A Generally, it would be that in terms of a manufacturing
19 defect that something was not attached or not fastened or
20 welded or glued or put together in a manner that it was
21 intended to.
22 Q Okay. And design defect would be?
23 A Just that the end product did not do as designed. In
24 other words, if you, I don't know, push an electric
25 button and it doesn't do what it's designed to do, then I

Page 29

1 would consider that to be a design or potentially
2 manufacturing, if there was something manufacturing with
3 it.
4 Q Okay. You use the term -- well, your opinion is that the
5 subject Sportage was not unreasonably dangerous. What do
6 you mean by that?
7 A Again, based on all of the information that we had
8 available to us to take a look at and evaluate on the
9 testing to the subject seating system, that it performed
10 in a manner that was very good as it relates to occupant
11 protection and energy absorption.
12 Q When you say -- sorry, were you going to say something
13 else?
14 A No, I don't think so.
15 Q So unreasonably dangerous would be if it performs in a
16 manner that's not good?
17 MR. MARTENSON: Is that a question?
18 MS. HARRIS: Yes.
19 THE WITNESS: Again, it depends
20 obviously on what you define as good and bad, but
21 certainly from an occupant protection and a seat system
22 standpoint, good performance is one that, you know, is
23 researched and published on and so I kind of go back to
24 that information as it relates to what is good and bad.
25 Q (By Ms. Harris) Well, that's what I was asking. How do

Gregory D. Stephens
January 26, 2018

Page 30

1   you define what's good and bad?
2   **A  It's generally looking from, again, a very global, not**
3   **necessarily related to this case standpoint, you are**
4   **looking at available information to see that it's doing**
5   **what it's intended to do in terms of absorbing energy**
6   **with consideration to seat back cases or seat system**
7   **cases that they are absorbing energy in a manner**
8   **consistent with how they are designed, in terms of**
9   **occupant protection.**
10  Q   Would it be possible for a seat to be designed such that
11      it absorbed energy but was also unreasonably dangerous
12      because of the level of energy it did not absorb?
13  **A  Yes.  I mean, if you go to an extreme end of that, if you**
14  **get down to very little energy or no energy that it's**
15  **absorbing, or a very little amount we will say, that's**
16  **not reasonable as it relates to the world of crashes and**
17  **what the government has expected out of us in terms of**
18  **seat systems, I would consider that not to be a good**
19  **design.**
20  Q   All right.  Do you have any understanding of, or have you
21      been provided with any information of what the legal
22      standard for product defect is under Alabama law?
23  **A  Well, I would defer to you two on that.**
24  Q   Right.  You haven't been provided any sort of -- any
25      legal standard, correct?

Page 31

1   **A  I don't know that I have.  If I have, it's, again, not to**
2   **my knowledge.**
3   Q   Would you agree that the term "unreasonably dangerous"
4       as you have used it would be a hazard beyond an ordinary
5       vehicle of its type?
6           MR. MARTENSON:  Object to form.
7           THE WITNESS:  I don't know.  I would
8       probably need to take a look at that in its context.
9   Q   (By Ms. Harris)  Okay.  Would you agree --
10  **A  What do you mean by hazard?**
11  Q   You don't know what hazard means?
12  **A  I have certainly an understanding of what a hazardous**
13  **condition could be.**
14  Q   Okay.  What about a safety issue?
15  **A  In the context of what?**
16  Q   Of seat performance.
17  **A  I would think that, you know, safety issues have to do**
18  **certainly with, as it relates to seat performance, would**
19  **have to do with issues of breaking apart in a manner that**
20  **it wasn't designed, or doing something abnormal in a**
21  **manner that it wasn't designed or intended.  And**
22  **sometimes those can rise to safety issues, sometimes they**
23  **don't.**
24  Q   Okay.  Would you agree with this statement, that a
25      vehicle is unreasonably dangerous if it's more dangerous

Page 32

1   than it should be?
2   **A  Again, it depends on what you mean by should be.**
3   Q   Well, who defines how dangerous a vehicle should be?
4   **A  Again, I'm not understanding the context of the question.**
5   Q   So you just can't say one way or the other whether you
6       agree with that statement?
7   **A  Well, again, I have my understanding of what -- how a**
8   **vehicle performs in terms of -- in the context of what we**
9   **are talking about seats, seat backs that, in my**
10  **understanding, absorb energy and provide ride down for**
11  **occupants are obviously doing as designed, absorbing the**
12  **occupant's energy and mitigating injuries in doing so.**
13  Q   All right.  Are not -- you use the terms "not defective"
14      and "unreasonably dangerous."  Are they the same thing?
15  **A  I don't know as it relates to the legal context, but**
16  **certainly as it relates to my understanding about**
17  **unreasonably dangerous.  I certainly don't see something**
18  **as being unreasonably dangerous that is doing what it's**
19  **designed to do, which means that it's not defective in**
20  **some context.**
21      **But then there's, you know, people -- or things that**
22  **are defective that are not necessarily unreasonably**
23  **dangerous.**
24  Q   I understand the distinction.  If it's unreasonably
25      dangerous, it's defective, but not necessarily the other

Page 33

1   way around?
2   **A  No, there's probably the other way around as well as I'm**
3   **thinking through all the global aspects of that.**
4   Q   Okay.  What do you mean?
5   **A  Meaning something can be unreasonably dangerous and yet**
6   **not defective depending on, you know, for example, it's**
7   **put together and it's using it for an unintended purpose**
8   **or something along those lines.  We are probably getting**
9   **into philosophical definitions.**
10  Q   You used the term which is why it's your number one
11      opinion.
12  **A  Certainly, and as it relates to seat back performance.**
13  **Obviously, when it comes down to being unreasonably**
14  **dangerous, you want something to act in the manner very**
15  **much like the Kia SL seat did.**
16  Q   If the seat performed in a way that was unreasonably
17      dangerous, would you consider that to be defective?
18          MR. MARTENSON:  Object to the form.
19      Vague.
20          THE WITNESS:  Again, it depends on the
21      circumstances.  And, unfortunately, I keep going back to
22      the idea is it being used in a manner that is
23      inconsistent with how it was designed.
24  Q   (By Ms. Harris)  So you can't answer the question?
25  **A  Without considering the globalness of it?**

1  Q  Right.
2  A  I apologize.
3  Q  All right.  Let's go back to I was asking you about when
4     you formed your opinions about defect.  I'm going to ask
5     the same question about your opinion regarding
6     unreasonably dangerous because you told me those are two
7     separate things.
8  A  Well, I told you --
9  Q  You can't tell me they are the same.
10  A  I opined on both of the terms.  They could be the same
11     for all intents and purposes in this particular instance,
12     but they are not always the same.
13  Q  Are they, in this instance?
14  A  I don't know.
15  Q  Okay.  When did you form your opinion that the subject
16     seating system was not -- is not unreasonably dangerous?
17  A  I would think similar answers would apply to your
18     questions concerning defect.
19  Q  Okay.
20  A  If you are going to ask.
21  Q  And the answer was when?
22  A  Evolving over the life of the case, and certainly
23     memorialized and finalized at the time of my report.
24  Q  Okay.  Did you have an opinion about whether the vehicle
25     was unreasonably dangerous before you had any

Page 34

1     understanding of Mr. Crittenden's medical condition?
2  A  Again, I don't know that I saw any indications of it
3     other than, you know, trying to understand and evaluate
4     the twist in the seat, which obviously I think addresses
5     your question.
6  Q  So you didn't believe the vehicle was unreasonably
7     dangerous before knowing anything about his medical
8     condition?
9  A  Again, it wasn't something that I certainly had come to
10     any final opinions on.
11  Q  But you didn't -- well, your opinion was that it wasn't
12     unreasonably dangerous.  That's what you just told me.
13  A  Certainly, in taking into account all of the information
14     and doing all of the evaluation that I have done.
15  Q  Right.  But did you have an opinion about that before you
16     had an understanding of his medical condition?
17  A  I couldn't tell you.
18  Q  You don't know?
19  A  I don't know.
20  Q  Okay.  Do you have an understanding of -- and I'm not
21     talking about his medical condition prior to the
22     accident, but his injury and the biomechanics of his
23     injury during the accident, and the resulting injury?
24        In other words, do you know whether it was a
25     hyperextension, a hyperflexion?  What type of injury did

Page 35

1     he have?
2  A  Oh, my understanding just in general?
3  Q  Yes.
4  A  Well, my understanding is that the kyphotic spine
5     essentially was straightened out, so that was effectively
6     my understanding of the injury production in terms of the
7     mechanics.
8  Q  Do you know whether he -- his injury was a hyperextension
9     or a hyperflexion injury?
10  A  Well, again, the motion is extension.  With regard to
11     hyper I will certainly defer to Dr. Banks on the
12     definitions.  But certainly it is motion that is an
13     extension direction, which is straightening out and
14     leaning back.
15  Q  Do you know what other injuries besides the extension
16     injury he had to his spinal cord?
17  A  And your question was injuries, what other injuries?
18  Q  Uh-huh.
19  A  I know there was other injuries.  I just couldn't tell
20     you as I sit here without referring to Dr. Banks, which
21     ones.
22  Q  All right.  But you don't have any independent
23     understanding of any other injuries?
24  A  It's not certainly something that I have studied for
25     purposes of that question.

Page 36

1  Q  Okay.  You were sitting here for Mr. Blaisdell's
2     deposition and he said he didn't know that there was a
3     dispute about the nature of Mr. Crittenden's spinal
4     condition prior to the accident.  Do you remember that?
5  A  I think so.
6  Q  Okay.  Do you know whether there is a dispute about that?
7  A  I don't know what Mr. Kennett's knowledge is on that.
8     And I don't know -- I don't know that I have seen any
9     sort of a doctor hired by you guys in that regard.
10  Q  Okay.
11  A  So I couldn't tell you.
12  Q  If it turns out that -- again, you know, we have got a
13     number of depositions to be taken and there will be
14     witnesses who come to trial who won't be deposed, but if
15     it turns out there is in fact a dispute, will that affect
16     your opinions?
17  A  Well, certainly I will take that into account, as I
18     normally take into account various evidence.
19  Q  Okay.
20  A  But certainly from a seat performance standpoint, I have
21     opinions on how, you know, the manner in which it was
22     loaded and type of forces involved.
23  Q  Okay.  That won't change -- that won't change your
24     opinions about what happened -- what the seat did during
25     the accident, it might change your opinions about how he

Page 37

10 (Pages 34 to 37)

Gregory D. Stephens
January 26, 2018

1     was injured, correct?
2  **A  I think it would -- it, again, would affect or go into my**
3     **analysis of how he might have loaded the seat.**
4  Q  Okay.
5  **A  In other words, I think you had asked earlier of his**
6     **medical condition versus his pre-impact position by his**
7     **own virtue, and it would tend to suggest that if somehow**
8     **somebody came in and he was -- and said he was straight**
9     **up and down, I would tend to think that, you know, the**
10     **straight up and down has to be positioned off to the left**
11     **to achieve the same damage.  Does that make sense?**
12  Q  Yes, it does.  I understand that, and I appreciate that
13     distinction.
14     If -- well, we will come back to that.  All right.
15     Assume one of the two medical conditions that you believe
16     when you talk -- when you talk about sort of the what did
17     you call it, exaggerated bending of the spine, curving of
18     the spine, is that how you phrased it?  Yeah, the curve
19     of the spine in both directions, right?
20  **A  Yes.**
21  Q  Both forward and laterally, and that's -- you have heard
22     the term kyphosis, right?
23  **A  Yes.**
24  Q  And scoliosis is the lateral direction, right?
25  **A  I would defer to Dr. Banks on that.  I apologize.**

Page 38

1  Q  What about the T1 and the T2 fusion that Dr. Banks says
2     he has, is that something that you had any independent
3     opinion about?
4  **A  Did you say T1 and T2?**
5  Q  I'm sorry.  T1 to L2.  T3 to L2.  I marked through the T.
6  **A  Understood.**
7  Q  Go ahead.
8  **A  You first.**
9  Q  Do you have an opinion about the -- any independent
10     opinion about that?
11  **A  It's not something that I have looked into other than**
12     **review of Dr. Sullivan's deposition and some of the**
13     **imagery that he put up.**
14  Q  Okay.  And if it turns out that Mr. Crittenden did not
15     have a fusion, would that affect your opinions?
16  **A  Well, again, it affects the opinions insofar as the**
17     **flexibility that one has in interacting with the seat.  I**
18     **would still be of the opinion that the seat was deformed**
19     **in a manner consistent with his motion and different from**
20     **the sled tests and, you  know, some of the opinions that**
21     **I have on that subject, but how it relates to injury**
22     **production, I would defer to Dr. Banks on that.**
23  Q  Okay.  What I'm trying to figure out is whether -- if it
24     turns out Mr. Crittenden did not have these
25     conditions as described by you from Dr. Banks, does that

Page 39

1     affect your opinions about whether the vehicle was
2     unreasonably dangerous?
3         MR. MARTENSON:  Object to the form of
4     the question.  It misstates the prior testimony.
5         THE WITNESS:  And, again, from a seat
6     system evaluation standpoint, obviously, I think most of
7     my other evidence supports that opinion as opposed to his
8     condition.
9  Q  Okay.
10  **A  And, again, it gets back to the idea that one of my final**
11     **opinions is that I would think that a normal occupant,**
12     **one that does not have the fragile type condition that he**
13     **has, would do fine in this seat as it relates to this**
14     **particular accident circumstances, based in large part on**
15     **the amount of data that we have looked at to evaluate**
16     **that.**
17  Q  Right.  But that is assuming he has the condition.  My
18     question is if he doesn't have the condition and he still
19     gets the injury, does that affect your opinion?
20  **A  I wouldn't expect him to get the injuries if he doesn't**
21     **have some sort of a condition because the forces that we**
22     **have done and evaluated in the analysis of the seat**
23     **system show that it is lower forces than what you**
24     **would -- I guess what we have in terms of some of the**
25     **other analysis in terms of comparisons.**

Page 40

1     **And so I'm using that as a basis to understand the**
2     **forces that were likely imparted on Mr. Crittenden, which**
3     **I would think most -- and most of what we have evaluated**
4     **is that showing that it is, relatively speaking,**
5     **non-injurious forces.**
6  Q  Okay.  So you would have no explanation for how he gets
7     this injury if he doesn't have these conditions?
8  **A  I would defer to Dr. Banks on that -- sorry.**
9         MR. MARTENSON:  I was going to object
10     to it's beyond your testimony.
11  Q  (By Ms. Harris)  Go ahead.
12  **A  I would defer to Dr. Banks on that as it relates to this,**
13     **and certainly, you know, as it relates to the kinematic**
14     **motion, I think there's going to probably be some**
15     **overlapping in understanding how that would maybe**
16     **translate into a nonconditioned condition, the question**
17     **that you are asking.**
18  Q  (By Ms. Harris)  Right.  And what I'm trying to
19     understand is simply whether you would have an opinion --
20     well, whether you would have an opinion about the seat
21     performance and whether it's unreasonably dangerous if he
22     did not have this condition, if it turns out he did not
23     have the condition described by Dr. Banks?
24  **A  Again, I would defer back to in terms of how I have**
25     **approached the case and what I have been asked to do in**

Page 41

11 (Pages 38 to 41)

| | |
|---|---|
| 1 terms of my analysis of the case and the seat system. | 1 A Again, I would defer to Dr. Banks on that. But, again, |
| 2 Everything that I would suggest, and have evaluated, | 2 my evaluation as it relates to the seat back performance, |
| 3 would suggest that it performed in a manner as expected, | 3 assuming that he is receiving this injury as a result of |
| 4 given the level of accident severity and the positioning, | 4 simply straightening out, is that he's going to receive |
| 5 if you will, imparted by him somehow. | 5 this injury almost regardless of what the seat does |
| 6 Q Regardless of what his condition was? | 6 because it's the collision forces that are straightening |
| 7 A Regardless, yes, ma'am. Obviously, the condition kind of | 7 him out and the seat's resistant to those. |
| 8 helps us understand a pre-impact position. | 8 Q All right. You list a number -- on Page 17 of your |
| 9 Q Okay. | 9 report a number of -- |
| 10 A But, again, I think you are asking, you know, assuming | 10 A Seventeen? |
| 11 that is the table then how else would you explain it, | 11 Q Yes. |
| 12 and I don't know at this point. | 12 A Last page? |
| 13 Q All right. So are you critical -- you said that Mr. | 13 Q Yes. You say that as a result of the crash energy |
| 14 Crittenden was out of position, right? | 14 management most rear-end collisions result in little or |
| 15 A Again, somewhat based on either his pre-impact | 15 no significant injuries to occupants of the struck |
| 16 positioning by his own voluntary manner or by his medical | 16 vehicle. |
| 17 condition, such that the outboard side of the seat got | 17 What do you base that on? |
| 18 loaded more than the inboard side. | 18 A The body of literature that studies rear-end crashes, and |
| 19 Q Are you critical of Mr. Crittenden For being out of | 19 in particular, all of the federal testing where they have |
| 20 position? | 20 instrumented dummies and understood the level of injuries |
| 21 A No, not necessarily. Obviously, that's one of the | 21 that that instrumentation would predict. |
| 22 benefits of yielding seats is that it takes into account | 22 Q Okay. Where in your files is all that material? |
| 23 some flexibility on the positioning. | 23 A I would defer or refer you to the reference material, the |
| 24 Q Okay. Would he have received this injury if he had not | 24 four volumes of reference material. And I would also |
| 25 been out of position as you say? | 25 refer you to the docket of material which has submissions |

Page 42 · Page 43

| | |
|---|---|
| 1 of that. | 1 yielding seats or -- |
| 2 Q Okay. Let's -- here's Volume 1. Tell me everything in | 2 MR. MARTENSON: Is it going to be in a |
| 3 that volume that supports your opinion that most rear-end | 3 white or it's going to be in the folder? |
| 4 collisions result in little or no significant injuries to | 4 THE WITNESS: Yes, yellow. |
| 5 occupants? | 5 MR. MARTENSON: Okay. I will get it. |
| 6 A Well, I could go through each one of these papers if | 6 Yielding seat info? |
| 7 you'd like. | 7 THE WITNESS: Yes. The first one, |
| 8 Q Does every paper support that? | 8 huh? |
| 9 A No, I'm not saying that. I'm just saying that there are | 9 MR. MARTENSON: Yes. |
| 10 certain parts of various papers that do talk about that, | 10 Q (By Ms. Harris) Okay. We will go ahead and mark that as |
| 11 which I thought was your question. | 11 Exhibit 23. |
| 12 Q It is. | 12 (Exhibit No. 23 marked |
| 13 A These four volumes of reference materials that we have | 13 for identification.) |
| 14 talked about, or certainly and I have talked about, have | 14 |
| 15 everything associated as we are able to collect with | 15 Q Before you talk about this PowerPoint, tell me did you |
| 16 regard to seats. Some of them actually talk about injury | 16 put it together? |
| 17 mitigation, and others just talk about, you know, seat | 17 A This was, I believe, Mr. Blaisdell had -- |
| 18 design. | 18 Q Sorry. |
| 19 Q Right. Do you know that I'm here to ask your opinions | 19 A May I have the folder as well? |
| 20 and what you have to support them, and I need to know | 20 Q Sure. |
| 21 where in those materials, and we will go through all four | 21 A Thank you. Mr. Blaisdell had put some of this stuff |
| 22 of them, what literature supports that opinion. | 22 together, which in many respects put into a chronology. |
| 23 A Well, if I can refer you to a folder, there's a | 23 Q Right. He's done that for other cases. |
| 24 PowerPoint that we put together that talks about the | 24 A He certainly has done this for some of our seats. |
| 25 benefits of yielding seats. And I think it was entitled | 25 Q Right. That's a PowerPoint he's produced in a number of |

Page 44 · Page 45

| | Page 46 | | Page 47 |
|---|---|---|---|

1 cases, right?
2 **A I don't know.**
3 Q Okay.
4 **A I would defer to him on that. But this certainly goes**
5 **through the -- some of the main -- what I would consider**
6 **to be main references that are all contained in these**
7 **four volumes as far as the benefits associated with the**
8 **seat back relating to good occupant performance.**
9 Q That doesn't answer my question to any extent. Remember,
10 we are talking about your opinions that most rear-end
11 collisions result in little or no significant injury to
12 occupants?
13 MR. MARTENSON: Object to form and
14 comments of counsel.
15 Q (By Ms. Harris) How does that PowerPoint answer my
16 question?
17 **A It steps through the chronology of understanding seat**
18 **back deformation related to collision performance and how**
19 **that benefits occupants to answer the question of little**
20 **to no injury.**
21 Q Okay. So besides what Mr. Blaisdell put together, what
22 else can you point to me -- point to to support your
23 opinion about most rear-end collisions result in little
24 or no injuries?
25 **A Again, there might be some other references in here, but**

Page 46

1 I would --
2 Q You can't point to them?
3 MR. MARTENSON: Let him finish,
4 please, ma'am.
5 Q (By Ms. Harris) I didn't mean to cut you off. Sorry.
6 **A I apologize. I would point to a number of the rear-end**
7 **crash studies that the government has undertaken.**
8 Q Right here.
9 **A Pardon?**
10 Q You would point to them, so point to them. I need you to
11 identify them for the record.
12 **A I don't know that I have all of them here. There was a**
13 **number of studies done in the early to mid '90s**
14 **referenced in the research, not only that myself has done**
15 **but others have done in that regard, wherein the**
16 **government had instrumented dummies and studied the**
17 **effects of the seat performance. A lot of -- or at least**
18 **the concept of them are talked about in my seat paper,**
19 **which is actually Item No. 14 in this Volume 3.**
20 **And it identifies some of the testing that the**
21 **government has done in terms of evaluating that very**
22 **thing.**
23 Q But you didn't bring any of the testing with you?
24 **A No, I apologize. There's a lot of it. In addition to**
25 **that, I think that there was a set of studies -- if**

Page 47

1 **memory has it, it was in the late '70s, early '80s,**
2 **again, studying the same thing where dummies were**
3 **instrumented in terms of evaluating the effects of the**
4 **seat system performance in terms of NCAP level, N-C-A-P,**
5 **level crashes.**
6 Q Other than your paper and Mr. Blaisdell's PowerPoint,
7 what can you point me to to support your opinion about
8 rear-end collisions resulting in little or no injury?
9 MR. MARTENSON: Again, object to the
10 form. It doesn't list what he's earlier testified to.
11 Q (By Ms. Harris) Go ahead.
12 **A I think if you want the complete answer to that in terms**
13 **of everything that I have at least here in this room on**
14 **that, realizing I have talked about tests that are**
15 **outside of this room, it --**
16 Q You identified two. You identified a paper and a
17 PowerPoint. Identify for me everything else that you are
18 using to support that opinion?
19 MR. MARTENSON: Ma'am, he also
20 identified.
21 Q (By Ms. Harris) Go ahead. Just go ahead.
22 MR. MARTENSON: No. No. To comment
23 on your statement --
24 MS. HARRIS: This is the second time
25 I've asked you to stop speaking objections.

Page 48

1 MR. MARTENSON: No, you --
2 MS. HARRIS: That's twice.
3 MR. MARTENSON: No, you made a
4 speaking comment that he had only identified two things,
5 Ms. Harris, and that's not true.
6 MS. HARRIS: Well, he can tell me
7 that.
8 THE WITNESS: That's what I was going
9 to tell you.
10 Q (By Ms. Harris) Okay. Go ahead and tell me that.
11 **A I identified a number of tests that the government has**
12 **run in the early to mid '90s.**
13 Q Okay. But you didn't bring those.
14 **A I have some of them identified in my paper that I**
15 **identified for you as 14 in some of this material. There**
16 **was a number of papers -- or a number of tests done in**
17 **that time period that all had instrumentation. Those are**
18 **publicly available, and they go through the**
19 **instrumentation. They talk about how the dummies and the**
20 **ATDs performed in those tests relative to the seat back**
21 **deformation and yielding, so there's that group of**
22 **information.**
23 Q Right. But I'm asking what you brought here today. You
24 know that that's what I'm asking you, right?
25 **A No. I apologize. I thought you were asking me for**

Page 49

1 anything.
2 Q   No.  I'm asking what you brought here today to support
3 that opinion.  And you have identified the Blaisdell
4 PowerPoint and your paper.
5 A   The Blaisdell PowerPoint certainly summarizes that in
6 terms of a chronology that we discussed.  My paper
7 certainly talks about some of the available testing, or
8 examples of the available testing that you and I just
9 talked about.
10      I also identified for you that there was a series of
11 tests done in the late '70s, early '80s at the --
12 Q   But you didn't bring that.
13 A   I don't have those here, but I believe they are
14 referenced somewhere in here on some of that issue.
15      And, again, I could go through each one of these
16 papers if you would like and see if it identifies exactly
17 what you are asking, but I would say there's a number of
18 different references that do that.
19 Q   Okay.  I need you to tell me what you brought today to
20 support that?
21 A   Okay.  Did you want to stay on the record for this?
22 Q   Yes.
23 A   This might take a while.
24 Q   Yes, please.
25      MS. HARRIS:  Okay.  We can go off the

Page 50

1 record so he can change the tape.
2      THE VIDEOGRAPHER:  As we go off the
3 record this is the end of media unit number one, and
4 video time is 2:00 p.m.
5      (Recess 2:01 p.m. to
6      2:54 p.m.)
7
8      MR. MARTENSON:  The plaintiff's
9 attorney asked Mr. Stephens to -- said I want to see
10 everything you are relying upon in summary to state what
11 you stated on top of Page 17 of your report, most
12 rear-end collisions result in little or no significant
13 injuries to occupants of a struck vehicle.
14      He referred to four or five volumes of material
15 that's here, and she told him she wanted to -- him to go
16 through each of these volume binders, which he's been
17 doing now for a little over an hour, and that is part of
18 the deposition.  And she can say it's not, but it is.
19 It's requiring him during this time period to work and
20 look at what she requested for her deposition, and that's
21 part of the deposition.
22      MS. HARRIS:  And I move to strike Mr.
23 Martenson's colloquy as completely irrelevant, so let's
24 go off the record.
25      (Recess 2:55 p.m. to

Page 51

1      3:25 p.m.)
2
3      MR. MARTENSON:  Let me put it on the
4 record.  Are you finished, Mr. Witness, with reviewing
5 the five or six volumes of literature you were asked
6 to --
7      MS. HARRIS:  De, you don't get to ask
8 him questions.  I ask the questions.
9 Q   (By Ms. Harris)  Are you finished, Mr. Stephens,
10 reviewing or are you just taking another bathroom break,
11 or a bathroom break?
12 A   Yes, I'm going to take a bathroom break.  I have done
13 four of the volumes.  The only other two were the NHTSA
14 docket, and to a certain extent they are included in the
15 four volumes as well.
16 Q   How much longer do you think it will take because we are
17 trying to --
18 A   I would suggest now would be fine.  I think I have
19 included a number of different references.
20 Q   Okay.  Are you ready to go back on after your bathroom
21 break?
22 A   Yes, please.
23      MS. HARRIS:  Okay.  Go ahead and take
24 a break.  We might have a quick recess before that, but
25 go ahead.

Page 52

1      MR. MARTENSON:  Now for the record let
2 me state that this deposition began at 12:38 p.m.  At
3 1:46 p.m. the record will reflect that the plaintiff's
4 attorney asked Mr. Stephens to refer to the last page of
5 his expert report where it stated that most rear-end
6 collisions result in little or no significant injuries to
7 occupants of the struck vehicle, close quote, and she
8 requested or demanded that he show in these four or five
9 volumes of bound reference material everything that he
10 relied upon to back up that statement.
11      She stated, Let's stay on the record.  It is now
12 3:25 p.m. and he's just completed reviewing those
13 materials.  He has been at his witness chair this entire
14 time reviewing these multi volume binders to respond to
15 the attorney's questions.  And that certainly is part of
16 the time for the actual deposition, and responding to the
17 maximum federal rule's time for the federal rule
18 limitation on time spent in requiring a witness to spend
19 nearly two hours looking at volumes of materials to
20 answer the lawyer's questions.  That's all we have.
21      MS. HARRIS:  Good speech.  The record
22 will reflect what it reflects.  We are off the record
23 again.
24      (Recess 3:28 p.m. to
25      3:31 p.m.)

Page 53

14 (Pages 50 to 53)

1     
2      THE VIDEOGRAPHER: As we go back on
3      the record this is the beginning of media unit number
4      two. The time is 3:29. Please proceed.
5      Q (By Ms. Harris) Mr. Stephens you just spent
6      approximately two hours going through your materials,
7      correct?
8      **A Yes, at your request.**
9      Q And you reviewed every article that you brought; is that
10     right?
11     **A I certainly looked through them real quickly.**
12     Q Real quickly?
13     **A Yeah, meaning I kind of took a look at some of the**
14     **beginning pages, a little bit through the data, and a**
15     **little bit through the conclusion.**
16     Q And you needed to that in order to answer my question
17     which was, give me all of the supporting material for
18     your opinion relating to your opinion that quote, most
19     rear-end collisions result in little or no significant
20     injuries to occupants?
21     **A Well, if you recall, I responded to you indicating that a**
22     **lot of that material is contained in these four volumes**
23     **and I referred to them generically --**
24     Q Right.
25     **A -- or generically. And you, I interpreted, wanted me to**

Page 54

1      **specifically go through each one and identify which ones**
2      **that complement that opinion.**
3      Q Okay. And so you needed to look at every single one to
4      do that?
5      **A Again, if you wanted a specific answer to it, sure. I**
6      **thought that my first answer was okay.**
7      Q So yes, you needed to look at every single article?
8      **A I felt that that's what you were asking, yes, ma'am.**
9      Q Okay. Let's talk about your next opinion.
10     MR. MARTENSON: Do you not want him to
11     give you the answer, the documents that he relied on?
12     MS. HARRIS: We will get to that in a
13     just a second.
14     MR. MARTENSON: Oh, okay. So he spent
15     two hours getting the information you requested and now
16     you don't want him to give it to you?
17     MS. HARRIS: I want him to give me the
18     answer, but I want to go through the next question so
19     that we don't have to do this again.
20     Q (By Ms. Harris) All right. Your next opinion says
21     except under the certain -- except under certain
22     circumstances, including the following, right?
23     **A Yes, that is the statement.**
24     Q And when you answered the question which I asked two
25     hours ago, I want you to tell me whether those certain

Page 55

1      circumstances are addressed in the articles you are about
2      to identify for me, okay?
3      **A I think I understand you.**
4      Q Okay. All right. So if you can answer my question.
5      **A Which was what?**
6      Q Identify all the materials you brought here today which
7      support that opinion, that most rear-end collisions
8      result in little or no significant injuries to occupants
9      of a struck vehicle.
10     **A Again, I will refer to my previous answer on that, and**
11     **each one of those four volumes I went through to identify**
12     **various papers that talk about the benefits of yielding**
13     **seats.**
14     Q Did you tab them or make a note?
15     **A I attempted to, yes, ma'am.**
16     Q Okay. We will just read those into the record.
17     **A And then I think there probably --**
18     Q Or if you noted it on there then that's fine too.
19     **A No. I made a notation on the indexes as to which ones**
20     **they were.**
21     Q Okay. Let me see that. So you put a check by those?
22     **A Yes.**
23     Q And there are four binders for those?
24     **A Yes, ma'am.**
25     Q Okay. We have marked the first one?

Page 56

1      **A No, ma'am.**
2      Q We haven't marked the first one?
3      **A Not to my knowledge.**
4      Q Okay.
5      **A What we did mark was this PowerPoint which summarized the**
6      **chronology.**
7      Q Right. I just thought we marked one of those folders.
8      MR. MARTENSON: Can we mark this
9      Exhibit 23 on the outside we can keep it in the folder.
10     I know you marked it on the inside but we can just
11     duplicate it. Thank you.
12     Q (By Ms. Harris) Just so that we don't get out of order
13     here, I have marked you're billing records as Exhibit 24.
14     (Exhibit No. 24 marked
15     for identification.)
16    
17     Q And your set of DVDs and photographs as Exhibit 25.
18     (Exhibit Nos. 25 through 26
19     marked for identification.)
20    
21     **A And the DVDs are eight of them?**
22     Q Yes. We will talk about those in a minute.
23     All right. Let's mark your four binders as Stephens
24     27.
25     (Exhibit No. 27 marked

Page 57

15 (Pages 54 to 57)

1            for identification.)
2
3            MR. MARTENSON:  Could you read what it
4    is?
5            THE WITNESS:  Seat reference material
6    volume one.
7  Q  Exhibit 28.
8            (Exhibit No. 28 marked
9            for identification.)
10
11  A  Seat reference material volume two.
12  Q  29.
13            (Exhibit No. 29 marked
14            for identification.)
15
16  A  Seat reference material volume three.
17  Q  Exhibit 30.
18            (Exhibit No. 30 marked
19            for identification.)
20
21  A  And 30 is seat reference material volume four.
22  Q  Okay.  And you have noted in the indices of each of those
23    the answer to my question before?
24  A  Generally, yes, ma'am.
25  Q  Well, when you qualify it -- you know that when you

Page 58

1    qualify something as generally I have to respond, what do
2    you mean by generally?
3  A  That it has information in there relative to answering
4    that question.
5  Q  Okay.  And let's look at the next -- when say exceptions
6    occur under certain conditions, including the following,
7    and we can limit that last question to -- the first one
8    is when the person is prepositioned in such a manner that
9    the crash forces are applied to their body in an adverse
10    manner.
11      Does that situation apply to the accident scene or
12    accident sequence in this case?
13  A  Potentially, yes, ma'am.
14  Q  What do you mean potentially?
15  A  Meaning if he is offset off to the left as you and I have
16    talked about.
17  Q  Okay.  But you don't know whether he's offset?
18  A  Well, again, with the answers that I have previously
19    stated --
20  Q  Well, you think he's offset either because of his
21    scoliosis or just by his own body positioning?
22            MR. MARTENSON:  Object to form.
23    Misstates prior testimony.
24            THE WITNESS:  Obviously, it's one or
25    the other is applying a load on the outboard side of the

Page 59

1    seat.  And I also said that it was potentially related to
2    the reconstruction.
3  Q  (By Ms. Harris)  I'm sorry.  Explain that last part?
4  A  Meaning that there is some forces that are not purely
5    longitudinal that would drive him one way or another in
6    the seating system.
7  Q  Okay.  We will get back to the reconstruction in just a
8    second, but are you telling me that it's either an offset
9    or he's out of position?
10  A  Or some combination.
11  Q  Okay.  All right.  The second one you indicate here that
12    the subject case is an example of the situation.  What
13    about the third, when the collision is sufficiently
14    severe that the energy management system of the vehicle
15    cannot moderate the collision forces to the body, is that
16    in here?
17  A  I believe that through our analysis that we have
18    performed on this case that we have tended to indicate
19    that the energy management systems present on the subject
20    vehicle, and given the accident circumstances, would have
21    acted in a manner to prevent those type of injuries,
22    assuming all the other facts not to be the case.
23  Q  Okay.  So C doesn't apply to the facts of this case?
24  A  Correct.
25  Q  Okay.

Page 60

1  A  Again, notwithstanding the fact that he may be offset,
2    which is limiting what the seat can do.  That goes more
3    towards one.
4  Q  I gotcha.  And then D doesn't apply, right?
5  A  Not to my knowledge, in the way I have worded it.
6  Q  Okay.  So any of the articles that you have checked on
7    the indices, do they relate or support your opinion for
8    A?
9  A  I'm sure some of them do, yes, ma'am.
10  Q  You just read them all?
11  A  Yes.  And it's -- it's -- A is essentially dealing with
12    the out of position.
13  Q  Right.  And which of those articles are you going to use
14    to support your out of position opinion?
15  A  I would defer to the four exhibits obviously that we
16    talked about.  They are pretty obvious.  A lot of the
17    ones that have actually studied out of position and how
18    it's adversely affected by the rigidification of the
19    seat.
20  Q  Right.
21  A  And then there's a number of them that have talked about
22    high retention seats and how that affects.  So I would --
23    sincerely, a lot of them that I have actually marked
24    actually are respondent to that.
25  Q  Are any of the ones that you have not marked that you

Page 61

16 (Pages 58 to 61)

1     would use to support that position?
2  A  I can't think of any off the top of my head.
3  Q  You just looked at them?
4  A  Right.  I understand.  There was a lot of them.  I
5     apologize.
6  Q  What about B, are there any that you did not mark that
7     you would use to support your position for letter B?
8  A  I don't know that, again, having just gone through the
9     articles that any of them really addressed predisposition
10    to injury.
11  Q  Okay.  Did you bring any materials with you to support
12    your position -- excuse me, your opinion for B?
13  A  I think that there is a number of things with regard to
14    my analysis.  Again, under the assumption that
15    straightening out is primarily responsible for the injury
16    that would support B and, you know, to a certain extent
17    if, again, you take the understanding and idea and
18    concept that straightening out is also reflective in the
19    research as well.
20  Q  Well, is there any research that you are going to point
21    to to rely on for your opinion in B?
22  A  Again, under the assumption that straightening out is
23    responsible for the injury, I would point to a number of
24    the crash tests that are reflective not only in the
25    research but the stuff that we have studied in this case.

Page 62

---

1  Q  Well, what decides the research?
2  A  I would point us to some of the studies on the SAFE
3    testing, the Kia testing, and then the Sebring testing
4    that we have analyzed through this case.
5  Q  How does the Kia testing in any way support position B?
6  A  Again, with the idea in mind that if you are talking
7    about a condition that where an occupant is starting in a
8    forward hunched over area, the crash forces, again,
9    notwithstanding the seat, are essentially straightening
10    out the person.
11        And assuming that that is playing a role in the
12    injury production, that is happening in almost every
13    crash test and in almost every stiffness range of seats.
14    So what it does is it describes that motion that we see
15    reflective in the crash testing.
16  Q  All right.  Let's keep going down your opinions.  Your
17    opinion related to the seat strength range, or seat
18    strength from Mr. Blaisdell -- I just completely forgot
19    his name -- from his testing, that supports your opinion,
20    that third opinion, right?
21    And going sentence by sentence.
22  A  Third opinion meaning the seat?
23  Q  No, sorry.  I'm down on the next paragraph.
24  A  Okay.
25        MR. MARTENSON:  Under summary?

Page 63

---

1        MS. HARRIS:  Yes.
2        THE WITNESS:  The extent and nature of
3    the damage sustained by the driver's seat?
4  Q  (By Ms. Harris)  Yes.  That's supported by Mr.
5    Blaisdell's test, right?
6  A  There's two things, or actually probably three things.
7    Number one, it's the seat strength that Mr. Blaisdell had
8    performed on the subject seat, or I'm sorry, the exemplar
9    seat.
10        Number two, it's the testing performed by Kia at
11    severe rear impact levels that show the containment and
12    the force moderation.
13        And then number three, if you take a look at the
14    SAFE testing, which again shows greater deformation than
15    what was performed in the Crittenden accident.  It also
16    shows, you know, relatively speaking, containment
17    assuming proper dummy and belt positioning.
18  Q  Anything else you are going to use to support that
19    position?
20  A  I think those are the three main ones.
21  Q  Okay.  And then we have a few more opinions, but we will
22    come back to those in just a minute. Let's go back to
23    your seat damage analysis.  Were your measurements
24    substantially the same as Mr. Meyer's?
25  A  Where are you referring to?

Page 64

---

1  Q  Page 3 of your report.  And when I say "measurements,"
2    I'm really just talking about the deformation
3    measurements.
4  A  I believe some of them were.  I would suggest certainly
5    the starting position if you go to the table that's on
6    Figure 25.
7  Q  Right.
8  A  The starting position of the accident seat, the recline
9    angle at the end of the event, which is the plastic -- or
10    the static position, and then the permanent deformation
11    numbers there would be reflective of the Meyer position.
12        The two values that you see there, in terms of
13    maximum recline and dynamic deformation, I think would be
14    somewhat different.  Obviously, with regard to the 12
15    degrees that Meyer suggests on dynamic, I believe if you
16    add that to the 47 you are going to actually end up with
17    a value for that one right above there something less
18    than 60 degrees.
19  Q  Okay.  Walk me through that again.  I was with you up
20    until --
21  A  You were doing good.  I'm not sure that I would
22    necessarily argue with the 12 degrees dynamic
23    deformation.
24  Q  Okay.
25  A  But if you add that to the 47, you are effectively going

Page 65

17 (Pages 62 to 65)

Page 66

1   to be at just under 60 degrees, 59 to 60 degrees instead
2   of 65 stated by Meyer.
3  Q  Okay. So you just think he did the math wrong?
4  A  **I don't know. It was just that this came right out of**
5   **his report.**
6  Q  Okay. So what do you believe the true dynamic
7   deformation -- I'm sorry, the maximum recline angle?
8  A  **I would think it would be about 59 to 60 degrees.**
9  Q  All right. Any other measurement or numbers with respect
10   to the seat deformation that you believe are
11   significantly different than Mr. Meyer's?
12  A  **No. I think the rest of them are pretty well known, so I**
13   **think we are in agreement.**
14  Q  All right. When you did the de-trim with Mr. Meyer, you
15   guys came up with a -- you agreed on the position of the
16   seat as it's reflected in the scene photos, correct?
17  A  **The at scene documentation.**
18  Q  Right. And do you have any opinion as to whether that --
19   that -- how the seat was immediately after the accident?
20      In other words, do you believe anyone moved the seat
21   between the time of the accident and those photos?
22  A  **No. And the reason I say that is essentially because**
23   **that position, as reflected by the recliner position,**
24   **seemed to correlate to an appropriate starting position.**
25  Q  Okay.

Page 67

1  A  **Which is that 20 and a half degrees at the top of that**
2   **chart.**
3  Q  Okay. Just want to make sure that there's no -- that you
4   are not going to say that you believe someone moved the
5   seats, but that's where it was after -- immediately after
6   the accident?
7  A  **Yes. And that was reflected in those numbers that we**
8   **were just looking at.**
9  Q  Right. Do you have an opinion as to the position of the
10   head restraint immediately before the collision?
11  A  **I don't know that I have studied that with any big**
12   **analysis on that. There were -- there was a position**
13   **that I documented in my inspection of the vehicle that**
14   **reflected it was about two inches above the highest**
15   **position. And so if it started off in the highest**
16   **position, obviously it was moved an additional two inches**
17   **as it was being bent.**
18  Q  But you had no evidence as to whether it was in the
19   highest and whether it was in the middle or the lowest
20   position?
21  A  **I did not study that; that is correct.**
22  Q  Okay. Did you sign a protective order in this case?
23  A  **I don't know. I could look through the legal documents**
24   **if it would be in there.**
25  Q  Would you have signed it and put it in here, or just put

Page 68

1   a copy of it in here?
2  A  **I don't know. It might have been just sent back if I**
3   **did.**
4  Q  I saw a correspondence which you were sent a protective
5   order, and I just didn't know if you remember signing it?
6  A  **I don't have a memory, but I probably did if I was sent**
7   **it.**
8  Q  Take a quick look through this.
9  A  **I don't see a protective order in here.**
10  Q  Okay. These legal documents, are there any of these that
11   you relied on in forming your opinion?
12  A  **Not directly.**
13  Q  Let's talk about the design of the subject seat a little
14   bit. You describe it as a high retention seat?
15  A  **Yes, ma'am.**
16  Q  What do you mean by that?
17  A  **Meaning that it has a higher strength perimeter frame**
18   **that allows the body in the torso area to pocket into the**
19   **center area.**
20  Q  And when you say "pocket," describe for me what you mean
21   by that?
22  A  **Meaning the mid section of your body, lower to mid**
23   **section are moving into the seat frame with enough**
24   **movement, in terms of a forward to aft movement, where it**
25   **constitutes some ability of the body to actually kind of**

Page 69

1   **pocket or mechanically get almost stuck in there, if you**
2   **will.**
3  Q  What design characteristics are required for a high
4   retention seat?
5  A  **Usually, a higher strength perimeter frame. Obviously,**
6   **Dr. Viano talked about that a little bit more, but**
7   **generally you are talking about a perimeter type frame**
8   **with a softer mid section that allows the body**
9   **translational motion into it.**
10  Q  Is there a certain amount of translational motion that
11   the seat must allow for it to be considered a high
12   retention seat?
13  A  **If there is I don't know of any. I would have to review**
14   **Dr. Viano's material.**
15  Q  You don't have any opinion on that, correct?
16  A  **Well, I would constitute necessarily any pocket, any**
17   **movement into that mid section of the seat without**
18   **corresponding rotation to be the effective pocketing.**
19  Q  Okay. So that's enough for it to be a pocketing for a
20   high retention seat?
21  A  **Pocketing consistent with a high retention seat.**
22  Q  All right. This seat had an active head restraint,
23   correct?
24  A  **Yes, ma'am.**
25  Q  Tell me what you believe the purpose of an active head

18 (Pages 66 to 69)

**Page 70**

1   restraint is.
2   A   Again, in this initial motion, again, for low and
3   moderate speed impacts, what it was designed to do or at
4   least the concept was designed to do was provide the
5   pocketing, or have the pocketing of the body, if you
6   will, act in a manner to move the headrest in such a way
7   where it would engage the head earlier in the crash to
8   keep for low and moderate speed impacts better head and
9   neck and torso alignment.
10   Q   And this is -- you don't --
11   A   In this particular design.
12   Q   You don't characterize this crash as a low to moderate
13   speed rear impact, do you?
14   A   I don't.
15   Q   Okay.  So do you believe that the active head restraint
16   was -- in any way played any role in the seat performance
17   in this case?
18   A   Well, what it does is that it tends to elevate the head
19   restraint in such a way where it actually acts in a
20   manner to help capture the occupant a little bit more.
21   But, again, depending on his position, and I would defer
22   to Dr. Banks on this, it may have some other effects, if
23   you will, that might influence his kinematics.
24   Q   Well, are you going to offer any opinions as to whether
25   the active head restraint affected his kinematics in this

**Page 71**

1   case?
2   A   No.  I think what I was going to offer the opinion of as
3   it relates to that active head restraint is that it
4   reacted in a proper manner to move up and forward to
5   better catch the head.
6   Q   Was the active head restraint engaged when you found it?
7   A   When I inspected it?
8   Q   Yes.
9   A   It was after the crash.  No, it had gone back into a push
10   down state, if you will.
11   Q   So how do you know that it ever engaged?
12   A   Again, from the standpoint of knowing the severity of the
13   crash and my study of all of the available material
14   showing how it interacts with the head, and then it gets
15   to a point, in terms of seat back deformation, where the
16   head and neck complex probably acted in a manner to bend
17   it back into a nondeployed state.
18   Q   But there's no forensic evidence to show whether or not
19   it engaged or not?
20   A   Well, again, based on my understanding of the crash
21   physics I would think it would.
22   Q   Right.  But no forensic evidence on the head restraint
23   itself or the seat?
24   A   I don't know that I have studied it for that purpose, but
25   I don't recall anything that would be a fingerprint as to

**Page 72**

1   engaged or not engaged.  There might be some damage on
2   the little headrest guides, but I don't know that I have
3   studied it to compare whether or not it engaged or
4   disengaged.
5   Q   Okay.  You don't know of any forensic evidence at this
6   point then?
7   A   At this point, beyond the physics of the crash, no.
8   Q   Okay.  So you are going to leave -- well, do you have an
9   opinion about whether the active head restraint did in
10   fact mitigate the injuries in this case?
11   A   Well, again, I would -- number one, I would leave the
12   injuries to Dr. Banks.
13         Number two, again, to the extent that it would have
14   acted in a manner to moderate those, I think our crash
15   severity is above and beyond what it was designed for, so
16   I don't know that it was necessarily designed for this
17   particular type of crash in terms of mitigation.
18   Q   So do you have an opinion as to whether he would have
19   received the same injury had there not been an active
20   head restraint, or are you going to leave that to Dr.
21   Banks?
22   A   Again, if his injury, the one that we have been talking
23   about most of the day, has to do with the effect of
24   straightening out, I would think it happened regardless
25   of the active head restraint.

**Page 73**

1   Q   Okay.  Do you know what other Kia vehicles have active
2   head restraints?
3   A   As I sit here, I don't.  I have not made that study.
4   Q   Do you know if any other non Kia brand vehicles have
5   active head restraints that are similar in design, that
6   you would consider to be similar in design?
7   A   Well, first of all, without doing a specific study of the
8   range of active head restraints, there's probably
9   differences of design out there in terms of how they
10   apply it.  But, in general, the concept, many of the
11   automotive manufacturers employed this concept of a
12   beavered type of design, meaning you had to push in the
13   mid section or somewhere in the mid section to be able to
14   move and moderate the geometry of the head restraint.
15   Q   Well, that's -- all active head restraints have that
16   design, correct?
17   A   No.
18   Q   What's the other design?
19   A   There are some that are deployable that are based off of
20   an electronic sensing that's actually deployed forward.
21   Q   Okay.  So besides the electronic sensing and then the
22   other more mechanical actuated design, are there any
23   other designs for active head restraints?
24   A   I think the other ones would be -- and I'm not sure if
25   they would be considered active.  They are accomplishing

**Page 74**

1    the same feature by changing the geometry of the head
2    restraint such that it engages the head earlier, which is
3    again the whole reason for the concept.
4  Q  Okay.  And how do those work?
5  A  Basically on geometry.  Meaning, you put the head
6    restraint either by design of the seat frame and/or the
7    design of the head restraint itself you put it closer to
8    the head so it engages earlier.
9  Q  Have you reviewed any design documents relating to the
10    generation of the Sportage?  I can't remember off the top
11    of my head what -- but it's the generation after the SL.
12  A  I probably have seen some documents in my file that were
13    produced on that.  Was it the QL or something along those
14    lines.
15  Q  That might be it.  Did you make any attempt to analyze
16    the seat performance of the QL seats?
17  A  I don't know that I have conducted analysis.  I think
18    there was some videos, if I remember right, that showed
19    some performance information.
20  Q  Okay.  And do those in any way affect your opinions in
21    this case?
22  A  No, ma'am, at least not as I understand what I was asked
23    to do.
24  Q  Okay.  With respect to the restraints in this case, did
25    the vehicle have a rear fired pre-tensioner in the seat

**Page 75**

1    belt?
2  A  What does that mean?  You mean rear impact fired?
3  Q  Yes.
4  A  Oh, I apologize.
5  Q  Well, that's my understanding of what they are, if
6    there's something that you know that I don't, you know,
7    you can explain that.
8  A  No.  I don't know that I have studied that for this case.
9  Q  Do you know whether the vehicle had that?
10  A  I don't know.
11  Q  Do you believe that rear fired pre-tensioners help
12    prevent ramping, rear impact?
13  A  I would probably have to study some of my testing on
14    that.  We have testing where we have rear impact fired
15    pre-tensioners.  I can't think of a study where we have
16    actually studied non and rear impact fired to make that
17    comparison.
18  Q  So you have never offered any opinions in any case
19    relating to whether rear fired pre-tensioners help
20    prevent ramping?
21  A  They can help, I believe, but I don't know that I have
22    made that study to be able to quantify that.
23  Q  Okay.  You base that -- you haven't done any studies on
24    that, but you believe they do help?
25  A  It was based in -- that answer was based on concept, that

**Page 76**

1    if they are fired in such a way and such a timing and
2    such a manner, depending on the occupant and depending on
3    the severity it could take some slack out of the belt and
4    start to limit it.
5  Q  That's their whole goal, their purpose?
6  A  That's one of their purposes.
7  Q  Okay.  Do you know of any other Kia vehicles that you
8    consider to have similar seat structures?
9  A  I don't know that I have made that study.
10  Q  All right.
11  A  As we sit here.
12  Q  Have you studied any other Kia vehicles with respect to
13    seat strength?
14  A  Well, they might be on some of our seat tests.  That's
15    the only way I would know to answer that as I sit here.
16         MR. MARTENSON:  You are referring to a
17    document?
18         THE WITNESS:  I am referring to
19    Exhibit 3 from Mr. Blaisdell, which is the listing of all
20    of the seat tests.
21         MR. MARTENSON:  Okay.  Thank you.
22         THE WITNESS:  There's a 2010 Kia
23    Forte, F-O-R-T-E.
24  Q  (By Ms. Harris)  What was the seat strength of that
25    vehicle?

**Page 77**

1  A  It appears to be 27,552 in terms of inch pounds.  There's
2    the 2007 Kia Spectra and that was indicated to be 35,140
3    inch pounds.  There's the Kia Sportage in our particular
4    case that we discussed at 41,654.  There's the 2006 Kia
5    Rio indicated to be 26,810 inch pounds.  There's the 2015
6    Kia Soul which is indicated to be 23,702 inch pounds.
7         MR. MARTENSON:  How much?
8         THE WITNESS:  23,702.  By the way, is
9    this responsive to your question going through?
10  Q  (By Ms. Harris)  Yes.
11  A  Okay.  There's the Kia Rondo which is indicated to be
12    22,596 inch pounds.  The Kia Optima which is indicated to
13    be 19,768 inch pounds.
14  Q  What model year is that, the Optima?
15  A  It indicates on here 2014.
16  Q  Okay.
17  A  There's a 2006 Kia Optima that is 18,620 inch pounds.
18    There is a '95 Kia Sephia indicated to be 14,000 inch
19    pounds.  Sephia is S-E-P-H-I-A.  There's a '98 Kia Sephia
20    that's indicated to be 11,970 inch pounds.  There's a
21    2004 Kia Sedona indicated to be 11,774 inch pounds.  A
22    '98 Sportage indicated to be 11,200 inch pounds.  And
23    that's it on this list.
24  Q  And based on those seat strengths, is it your opinion
25    that any of those vehicles are defective?

**Page 78**

1   A  I don't know that I have studied each one of them.
2   Q  Okay. Can you make an assessment based simply on the
3   numbers from that graph and that spreadsheet?
4   A  Again, without knowing something about what we are
5   studying, I don't know that you can necessarily make
6   those assumptions. It seems like, given the time frame
7   for all of those, those are all fairly respectable
8   numbers as it relates to strengths.
9   Q  Okay. Based on those numbers alone, can you say that
10   those vehicles are not defective with respect to seat
11   performance in a rear collision?
12   A  I don't know that I can make that at this point in time,
13   but, again, the numbers seem to be relatively respectable
14   given their time frame.
15   Q  All right. Have you made any assumptions about Mr.
16   Crittenden's weight at the time of the accident?
17   A  I have an indication in my report that indicates that he
18   was at least 230 pounds. And I understand from some of
19   the discovery that there were values pushing it right
20   around 250 pounds.
21   Q  Okay. Well, an occupant's weight is always a factor in
22   your analysis of a seat performance, correct?
23   A  It can be, yes.
24   Q  Okay. Give me an example when it would not be a factor
25   in your analysis.

**Page 79**

1   A  And, again, are you referring to just rear impacts just
2   in general?
3      I don't know that once you get below a fifth
4   percentile that it starts to have a meaningful effect on
5   very rigid seats where you can tell differences.
6   Q  But you always want to know the occupant's weight when
7   you are assessing or analyzing a seat performance during
8   a rear impact, correct?
9   A  It certainly can be important, yes, ma'am.
10   Q  Okay. Do you always ask for the occupant's weight to --
11   can you determine whether a seat was defective or can you
12   analyze the performance of a seat without knowing the
13   occupant's weight?
14   A  I think most of the time we are in need of an
15   understanding of the occupant's weight. And in a number
16   of respects we are in need of understanding the weight
17   distribution in some way shape or form.
18   Q  Okay. You mentioned -- okay. So do you have an
19   opinion -- strike that.
20      Did you make an assumption about his weight?
21   A  Again, most of it was -- came from either the medical
22   records or the doctors and specifically Dr. Banks.
23   Q  Okay. And your assumption was 230 pounds, correct?
24   A  At least 230, yes, ma'am.
25   Q  And why do you say at least?

**Page 80**

1   A  I think I saw something indicative of something close to
2   like 249 or 250 pounds.
3   Q  Do you have an opinion as to what Mr. Crittenden's weight
4   was? When you say at least, you mean 230 or more?
5   A  Yes.
6   Q  Do you believe that it was more than 230?
7   A  I would defer to others probably closer to understanding.
8   Q  Like Mr. Crittenden?
9   A  Well, I would certainly defer to Dr. Banks and his review
10   of all the records.
11   Q  Would you defer to Mr. Crittenden?
12   A  Mr. Crittenden probably would have some information on
13   that I would think.
14   Q  Okay. You refer to -- you reference excessive weight on
15   Page 8 of your report. What do you mean by excessive?
16   A  Just above the 95th percentile as it relates to the
17   demands on the seat system.
18   Q  Anything below the 95th percentile is not excessive?
19   A  I don't know that I would necessarily make that
20   distinction.
21   Q  What is the 94th percentile?
22   A  I think it's -- I probably would have to look up the
23   values, but I think it's about 220 or a little bit more
24   than 220.
25   Q  And that's based on -- who comes up with these

**Page 81**

1   percentiles?
2   A  The U.S. Government.
3   Q  Okay. And --
4   A  And then there's usually some research studies that will
5   oftentimes go off of those.
6   Q  Okay. So that's where -- that's where you get the
7   numbers and that's how the dummies are sort of
8   classified?
9   A  Manufactured and classified, yes, ma'am.
10   Q  Right. And so if Mr. Crittenden had been 215 pounds,
11   would you have used the word excessive weight on Page 8?
12   A  I don't know. My suspicion is that I would indicate that
13   to be more of a heavier weight, but, again, that's not
14   having studied and known all of the different
15   circumstances.
16      In other words, I would think that if he were a
17   smaller weight, everything else being the same, the seat
18   deformation would be less.
19   Q  Are you critical of Mr. Crittenden for his weight?
20   A  No.
21   Q  Okay.
22   A  No. Again, it's just part of the body weight
23   distribution that I was talking about as it relates to
24   Mr. Meyer's test, I think, in the context of that test.
25   Q  What do you know about Mr. Crittenden's weight

21 (Pages 78 to 81)

Page 82

1  distribution?  Was he heavy around the middle?  Was he
2  built up top?
3  **A  Well, I don't know anything.  I would defer to Dr. Banks**
4  **one the subject of the weight distribution relative to**
5  **his medical records, but what I was talking about was Mr.**
6  **Meyer's testing utilizing a 50th percentile.**
7  Q  Right.  But I'm just -- you are relying on Banks for your
8  assumption for the weight distribution because you have
9  no other evidence to rely on, right?
10  **A  That's correct.**
11  Q  Okay.  All right.  Then the bottom of Page 8 after
12  referring to the excessive weight you have a calculation
13  that Mr. Crittenden imparted a peak force of nearly 1.5
14  tons to the subject Kia seat back.  How did you come up
15  with that number?
16  **A  That was effectively taking approximately two thirds to**
17  **70 percent of his body mass and then multiplying it times**
18  **the effect of 19G peak that the vehicle underwent.**
19  Q  Okay.  And do you have that calculation in your file
20  anywhere besides just the result here?
21  **A  No.  It was just a simple calculation that I did.**
22  Q  As you were writing your report?
23  **A  Yes.**
24  Q  All right.  So 70 percent of his body weight multiplying
25  by peak force of 19G, anything else that went into that

Page 83

1  calculation?
2  **A  No, ma'am.**
3  Q  Do you believe a vehicle should be designed to withstand
4  that peak force of 1.5 tons?
5  **A  A vehicle?**
6  Q  Yes.
7  **A  Well, the vehicle, I believe, if I understand your**
8  **question, withstands much more than that.  I would need**
9  **to go defer to Mr. Hoover on those calculations because I**
10  **believe he had calculated the force and the energies in**
11  **the crash --**
12  Q  Right.
13  **A  -- on the vehicle as a whole.**
14  Q  Do you believe that -- well, you say in here this was an
15  offset impact.  Is that based on Mr. Hoover's testimony?
16  **A  As well as my own personal observation of the vehicles at**
17  **the inspection.**
18  Q  And it was offset to the right?
19  **A  Yes, I believe that is correct.  As it relates to the**
20  **Sportage, correct.**
21  Q  Right.  And -- well to both?
22  **A  I think it would be to the left on the --**
23  Q  Right.
24  **A  Let me -- let me -- oh, sorry.**
25  Q  No.  You go ahead and clarify so the record is clear.

Page 84

1  **A  I think Mr. Hoover's report has a diagram that would**
2  **clear it up for both of us.**
3  Q  Right.
4  **A  Yes, I believe it would be more on the driver's side on**
5  **the Tahoe striking it.**
6  Q  And how does that offset, or how did that offset affect
7  the occupant kinematics, if any, during the collision?
8  **A  Well, again, if there's rotation involved as he seems to**
9  **indicate in a couple of his figures here, if you have**
10  **rotation during the impact that may change the direction**
11  **that the occupant interacts with the seat.**
12  Q  Okay.  Can you quantify the amount of rotation involved?
13  **A  I would defer to him on that.**
14  Q  Do you believe that Mr. Crittenden would have received
15  the same injuries had there been no rotation involved?
16  **A  I would defer to Dr. Banks on that.  But my suspicion,**
17  **again, given the forces involved and the effect of**
18  **straightening on Mr. Crittenden would suggest not -- or**
19  **would suggest that he would.**
20  Q  That his injury would be different?
21  **A  Would happen regardless.**
22  Q  Okay.  Going back through your crash analysis -- or
23  damage analysis, excuse me, at the bottom of Page 3, you
24  say "The driver's seat," and this is the last paragraph.
25  **A  Yes, ma'am.**

Page 85

1  Q  "The driver's seat as found was firmly attached to the
2  vehicle."
3     When you say "as found," what do you mean?  As you
4  first found it when you inspected the vehicle last year?
5  **A  Yes, ma'am.**
6  Q  Okay.  And Mr. Blaisdell testified earlier today about
7  the deformation in the SAFE testing seat versus the
8  deformation found in our seat, and I believe he
9  quantified it.  Did you make any independent analysis or
10  a calculation about the difference in the deformation in
11  the two seats?
12  **A  Between the SAFE tested seat and the subject Crittenden**
13  **seat?**
14  Q  Uh-huh.
15  **A  Apart from that summary of angles, and apart from the**
16  **photographs that we have available to us, no.**
17  Q  Well, I believe he testified that it was a difference of
18  eleven degrees, is that what he said?
19  **A  Let me check for you.**
20  Q  I just want to make sure that's your opinion as well.  So
21  I guess the question is, what's the difference in the
22  seat deformation from the SAFE seat versus the accident
23  seat?
24  **A  At the end of the deformation, if you look at Figure 25,**
25  **and you subtract 39 from 24, I believe you are going to**

22 (Pages 82 to 85)

**Page 86**

1    get upwards of 15 degrees. And I seem to remember he
2    said about 15 or 16, but I wasn't sure.
3   Q  Okay. We marked your inspection photographs earlier, I
4   believe, as Exhibit 25. And it's a collection of eight
5   DVDs. If you can just tell me what are on those DVDs.
6   A  Exhibit 25 has -- have seat or have Kia Sportage, the
7    Chevy Tahoe, the seat inspection, and the SAFE tested
8    seat inspection photos, as well as video from the seat
9    inspection, and I believe the SAFE inspection.
10   Q  Okay. And do those DVDs include all of your photographs
11   and videos from your inspections?
12   A  They seem to. The only ones that I don't necessarily see
13    in here are exemplar seat photos that were indicated
14    before that are in that black binder that you are looking
15    at.
16   Q  Do you have those electronically?
17   A  I probably do. I apologize. I didn't bring them.
18   Q  The exemplar seat inspection, did you do that -- that was
19   not -- strike that.
20      Was that the seat that was tested?
21   A  No, ma'am.
22   Q  You inspected an exemplar seat at SAFE back in April when
23   you did the de-trim, right?
24   A  I wasn't there for that. It was Mr. Blaisdell. Oh, did
25    you say back at Weil?

**Page 87**

1   Q  Uh-huh.
2   A  I apologize. Yes, I did.
3   Q  Okay.
4   A  And I think if you go a couple tabs before that there
5    should be those inspection photos.
6   Q  Did you find your exemplar to be the same as the exemplar
7   you inspected at Weil?
8   A  Yes.
9   Q  This notebook that I am attaching as Exhibit 31, titled
10   "CRA Inspection," looks like it has the inspection
11   photos -- printouts of the inspection photos on Exhibit
12   25, right?
13   A  Yes, ma'am.
14   Q  And, in addition, it has inspection photos from the
15   exemplar seat that you got?
16   A  Yes, ma'am.
17   Q  And then it has some notes in the back?
18   A  As well as in the front, yes.
19         (Exhibit No. 31 marked
20         for identification.)
21
22   Q  Okay. Are these typewritten notes, were they done by
23   you?
24   A  Yes.
25   Q  Same with the handwritten notes?

**Page 88**

1   A  Yes.
2   Q  When do you do those? Do you do those as soon as you
3   come back from the inspection or as you are preparing for
4   your report?
5   A  No. At the time of my inspection I have an iPad where I
6    was taking photos and then writing notes and doing
7    measurements.
8   Q  Okay. What are the notes in the back?
9   A  I believe those are test notes for the CRA tested seat,
10    the body block test.
11   Q  Were you there for the body block test?
12   A  I was not.
13   Q  So when did you take those notes?
14   A  These are not my notes.
15   Q  Okay.
16   A  These are --
17   Q  Are those Mr. Blaisdell's?
18   A  Either Mr. Blaisdell's or Mr. Sam White, which is an
19    engineer down in our southern office.
20   Q  Okay. Anything else in that binder that we haven't
21   identified?
22   A  I think we have identified most of it, yes.
23   Q  Okay. Most of it? Did we identify all of it?
24   A  I'm not sure if we identified the photographs of the SAFE
25    seat inspection afterwards -- or I'm sorry, the CRA seat,

**Page 89**

1    tested seat inspection after we had the seat sent up here
2    and I personally inspected it up here, so we have some
3    photographs associated with that back here in the back as
4    well.
5   Q  Okay. Did you make any notes?
6   A  No.
7   Q  All right. Now you have a section of your report where
8   you talk about Mr. Meyer's test, the SAFE test, and it
9   appears to be the same or at least substantially similar
10   to Mr. Blaisdell's report; is that fair?
11   A  A good majority of it is, yes, ma'am.
12   Q  You have several criticisms of the test, right?
13   A  Yes, ma'am.
14   Q  And they are the same as Mr. Blaisdell's, correct?
15   A  Certainly there's some similarities, yes, ma'am.
16   Q  Okay. Are there any differences in your criticisms?
17   A  Without holding the two reports up to each other and
18    comparing, I suspect there's not much difference.
19   Q  Well, you heard him testify today. Was there anything
20   you disagree with with respect to his criticisms?
21   A  No.
22   Q  Is there anything you would add?
23   A  I think that there was some discussion about -- I think
24    you had asked him about ramping as it relates to what we
25    know from the SAFE test, which I think he identified for

**Page 90**

1    you being about eleven inches or so --
2  Q  Uh-huh.
3  A  -- to the ramping seen in the Kia testing.  And I think
4    that with regard to that range, I would think that based
5    on the seat back deformation that we observed on the
6    Crittenden seat as it relates to the performance seen to
7    Mr. Meyer's test, I would think that would be closer to
8    towards the bottom of the ramping, if you will.  I
9    believe you had asked him where in that range.
10  Q  Right.  So do you have an opinion as to how much Mr.
11    Crittenden ramped during this accident?
12  A  Not specifically, but, again, I would defer to Dr. Banks
13    in terms of any surrogate type of work in that regard and
14    relationships to injury, but relative to the seat back
15    performance, I would think it would be more towards the
16    lower end of that as it relates to the ramping.
17  Q  Okay.
18  A  Given the fact that, you know, I have analyzed, as well
19    as Mr. Blaisdell analyzed the mispositioning of the belt
20    that you guys discussed earlier.
21  Q  Okay.  Well, you are the engineer.  What's half between
22    eleven and three?
23  A  Half -- well, eleven and four?
24  Q  Eleven and four.
25  A  It would probably be about six to seven.

**Page 91**

1  Q  Okay.  So it's your opinion that Mr. Crittenden ramped
2    less than six inches?
3  A  I don't know that I would necessarily rule out six at
4    this point in time, but I would defer to Dr. Banks on
5    specifics.
6  Q  Would it be somewhere between six and four?
7         MR. MARTENSON:  Object.  Asked and
8    answered.
9         THE WITNESS:  Again, I would defer to
10    him on the specifics.  I related it to the specific
11    deformation to the seat.  I would think that, again, if
12    you would just take the deformation of the seat it's
13    going to be less than that, but the important --
14  Q  (By Ms. Harris)  Less --
15  A  -- less than half.
16  Q  Less than six?
17  A  Which is what you indicated.  The problem is that you
18    would have to understand the mispositioning effect of the
19    belt, and I would defer to him on that.
20  Q  Okay.  The mispositioning of the belt, I think Mr.
21    Blaisdell categorized that as the belt being -- well, did
22    you classify the plate that bridges the gap as a
23    mispositioning of the belt?
24  A  No.
25  Q  That's different?

**Page 92**

1  A  That's -- obviously, that affects the -- in terms of the
2    material and the effect on the belt the slippage, but the
3    mispositioning of the belt means that with regard to it
4    starting up on top of the material and sitting loose
5    allows the dummy to ramp up higher than it otherwise
6    would if it had been properly positioned.
7  Q  Okay.  So were those your two criticisms of the position
8    of the belt?
9  A  Is the slippage and the mis- -- the wad of material, if
10    you will, that created excess slack.
11  Q  And do you have an opinion as to how much excess slack
12    was created?
13  A  Enough to allow quite a bit of ramping that we had just
14    discussed.
15  Q  Five inches?
16  A  I think it was upwards of eleven inches, if I remember
17    right.
18  Q  No, no, excess slack.  How much excess slack?
19  A  Oh, in the belt?  I don't know that I have studied that
20    specific number.
21  Q  Well, do you have a general number?
22  A  I don't, not without doing some more work.
23  Q  Would it have been five -- do you believe more likely
24    than not it would have been five inches of excess slack?
25  A  I don't know.

**Page 93**

1  Q  Could it have been five inches of excess slack?
2         MR. MARTENSON:  Object.  Asked and
3    answered.
4         THE WITNESS:  I don't know without
5    doing some more studies.
6  Q  (By Ms. Harris)  More likely than not, was it less than
7    two inches of excess slack?
8         MR. MARTENSON:  Object.  Asked and
9    answered.
10         THE WITNESS:  Again, I haven't studied
11    that at this point in time.
12  Q  (By Ms. Harris)  Okay.  You just know -- you just believe
13    more likely than not excess slack, period?
14  A  Which affected the ramping, yes.
15  Q  And presumably, if you don't know how much excess slack,
16    you don't know how much additional ramping that allowed,
17    correct?
18  A  Well, we do know from the Kia testing how much ramping is
19    allowed there in terms of -- or what is normal ramping,
20    if you will.  Obviously, with regard to that performance,
21    I would expect similar performance if you take into
22    account the increased severity imparted on the seat.
23  Q  Again, I was with you up until that last part.  If you
24    take into account the increased severity?
25  A  Yes.

Gregory D. Stephens
January 26, 2018

1 Q  Because he ramps more?
2 A  No, because the crash -- he's putting more force on the
3    seat and the seat is deforming that much more, so that --
4 Q  Which -- oh, go ahead.
5 A  I apologize.
6 Q  You go ahead.
7 A  But that obviously acts in a manner to continue to change
8    the geometry, and continue to put additional load on the
9    belt that affects his ability to climb up the seat.
10 Q  Okay.  When you say "the unusual belt positioning," is
11    that the same thing as mispositioning of the belt?
12 A  Yes.
13 Q  That's the excess slack from the wad of clothing?
14 A  Well, and this also seemed to also take into account the
15    slippage down on the thighs.
16 Q  Okay.  And that was my question earlier.  I'm trying to
17    understand when you say "unusual belt positioning,"
18    whether that refers to the clothes or does that also
19    refer to the plate, the metal plate?
20 A  Both.
21 Q  You said "The unusual belt positioning appears to account
22    for a substantial part of the additional seat back damage
23    that was present."
24      When you say "a substantial part," that leads me to
25    believe that there was some other factor that went into

Page 94

1    the additional seat back damage, so what would that be?
2 A  Probably some differences in the dummy versus Mr.
3    Crittenden's distribution and interaction.
4 Q  Do you know whether there were any differences between
5    the dummy's distribution and Mr. Crittenden?
6 A  I would defer to Dr. Banks on that.
7 Q  All right.  On the next page you have a heading that
8    says, "Responses to Steve Meyer's report and deposition
9    testimony."  And then I think the last sentence in that
10    paragraph you say, "Similar tests that he and others have
11    conducted on vehicles with automated seats that have half
12    the strength of this seat show dummy kinematics and
13    interaction with the vehicle interior that is more
14    severe, yet with head, neck, and chest accelerations and
15    forces that do not predict likelihood of a serious
16    injury."
17      What tests are you referring to?
18 A  Those are some of the tests that we referred to earlier,
19    certainly Mr. Blaisdell's testimony the Gueffroy, which
20    is G-U-E-F-F-R-O-Y, I believe, set of sled tests where
21    Mr. Meyer had instrumented the dummy and measured those
22    forces.
23 Q  Okay.  And those are in one of the exhibits that we have
24    already marked?
25 A  Yes, ma'am.

Page 95

1 Q  Okay.
2 A  And then I think by that statement I would also take into
3    account and refer to the same set of tests that you and I
4    were speaking of earlier, insofar as the government
5    testing where they have instrumented the dummies showing
6    little to no effect of injury outcomes on those.
7 Q  And where in your files is that government testing you
8    are referring to?
9 A  I would refer back to my paper for sure.  I documented a
10    number of tests, but it was in that section of 301 type
11    testing where they instrumented the dummy back in the
12    early to mid '90s.
13 Q  Right.  Other than your paper, point to me what
14    government testing you are referring to with respect to
15    your opinion.
16 A  I would say my paper and the tests that it references and
17    the other tests.
18 Q  But you didn't bring those tests today, the tests that
19    your paper references?
20 A  No, I didn't.
21      MR. MARTENSON:  That's your SAE paper?
22      THE WITNESS:  Yes, it is.
23 Q  (By Ms. Harris)  Other than your SAE paper that your
24    lawyer nicely pointed out that was your SAE paper,
25    anything else you can point to to support that last

Page 96

1    opinion we just talked about?
2 A  I think a number of the tests that, again, you have
3    previously marked and --
4 Q  Which ones?
5 A  Exhibit 19.
6 Q  Which tests support that opinion besides the one you just
7    told me about?
8 A  Again, just tests that where dummies were instrumented on
9    conventional yielding seats that show essentially good
10    performance over a wide range of severities tend to
11    support that point.
12 Q  Okay.  Which tests are you referring to?
13 A  I would just defer to the tests.
14 Q  You can't point to one?
15 A  I could point to the Audi test that we talked about.
16 Q  Okay.  Any other ones?
17 A  If you look at Exhibit 19, there's an Infiniti test in
18    Exhibit 19 that has a front conventional yielding seat
19    that shows good performance.  I believe the Rich,
20    R-I-C-H, tests also tested a conventional seat in
21    comparison to the more rigid seat and found good
22    performance as far as the IARVs.
23      And I believe in my report binder, the red binder
24    that's in front of you, there was an image that was also
25    in my report showing the two dummy interactions of the

Page 97

25 (Pages 94 to 97)

**Page 98**

1   one a conventional seat and one a rigid seat showing good
2   performance in the yielding section. That was this off
3   angle oblique impact.
4  Q  Is that Figure 26 in your report?
5  A  I think it's Figure 27.
6  Q  Okay. Any other tests you can point to for that opinion?
7  A  Certainly those are the ones that come to mind. I think
8   in my paper I referenced those tests that we were just
9   talking about in terms of the federal 301 tests. I can
10  read off a couple of the references for you.
11 Q  I was just wondering what you brought with you today.
12  That's your paper.
13 A  Well, the paper obviously by reference --
14 Q  Right.
15 A  -- we studied those tests.
16       THE VIDEOGRAPHER: Mr. Stephens, can
17  you please raise your microphone?
18       THE WITNESS: Oh, I'm sorry.
19       THE VIDEOGRAPHER: Thank you.
20       THE WITNESS: See, even your
21  microphone is getting tired.
22 Q  (By Ms. Harris) I'm getting tired.
23 A  It was references No. 27, 28, and I believe 29.
24 Q  In your paper?
25 A  Yes. Where they referenced tests done by the government

**Page 99**

1   with instrumented dummies.
2  Q  Okay. Anything else?
3  A  I'm sure there's more out there, but certainly that's
4   what I have brought.
5  Q  Are you critical -- well, are you critical of Mr.
6   Meyer for not instrumenting his dummy, the dummy in his
7   test?
8  A  To a certain extent. Obviously, I believe it would have
9   shown non-injurious values for that performance. And
10  obviously that performance was documented through seat
11  damage and deformation as well as the kinematics of the
12  dummy that we were able to come up with that opinion.
13 Q  Okay. So if you had done the test you would have
14  instrumented the dummy?
15 A  Again, notwithstanding the fact that we had the
16  opportunity to learn a little bit about the forces
17  associated with that, assuming that that was important,
18  that would have been good to -- having another data point
19  to understand the seat performance.
20 Q  So why didn't you do a sled test?
21 A  Again, with all of the material that we had available to
22  us in terms of the Kia testing, the government type of
23  testing, the 301Rs, as well as the SAFE testing, I think
24  we had enough data on the seat, as well as obviously our
25  static testing.

**Page 100**

1  Q  Okay. Are you critical of the type of dummy used,
2   standing pelvis?
3  A  In and of itself, no.
4  Q  You qualified that.
5  A  Meaning that if you position it properly and utilize the
6   proper type of interactions, as far as belt and restraint
7   and geometry, and positioning, I think, you know, it
8   provides another tool.
9   I think there's publications indicating out there
10  that there's no real difference between the two types of
11  dummies used in the rear impact testing.
12 Q  Okay. If you had done the testing, would you have used a
13  dummy with a standing pelvis?
14 A  I don't know.
15 Q  Okay. Are you critical of Mr. Meyer for using a 50th
16  percentile dummy and adding weight to it?
17       MR. MARTENSON: Object. Asked and
18  answered. Go ahead.
19       MS. HARRIS: He's not been asked that
20  question. Go ahead.
21       THE WITNESS: I believe we talked
22  about weight distribution type of stuff. I don't know
23  that the 50th percentile dummy in terms of getting to the
24  representative weight was the best choice, but I would
25  probably defer to Dr. Banks on that as it relates to Mr.

**Page 101**

1   Crittenden.
2  Q  (By Ms. Harris) What would you have done if you had done
3   the test?
4  A  I think I would have started probably with a 95th given
5   at least my knowledge as I sit here about his weight.
6  Q  Do you believe that the fact he used a weighted -- that
7   50th percentile changed the results or affected the
8   results?
9  A  May have.
10 Q  More likely than not?
11 A  I don't know that I could say that without studying a
12  little bit more of the anthropometry and weight
13  distribution.
14 Q  All right. Are you critical of the metal plate used by
15  Mr. Meyer over the gap, correct?
16 A  I think only insofar as we have discussed the interaction
17  with the belt, either by positioning the belt or by its
18  interaction with the belt during the crash, during the
19  movement.
20 Q  So are you or are you not critical of him using the metal
21  plate?
22 A  Again, the idea I think that I indicated to you is I am
23  not necessarily critical of bridging the gap, I think as
24  you had indicated. I think what I was critical of is its
25  interaction with regard to the belt performance seen and

Byers & Anderson Court Reporters/Video/Videoconferencing
Seattle/Tacoma, Washington

**Page 102**

1  observed in the video.
2  Q  Okay.  What would you have done?
3  A  Again, used a material or a concept that was a little bit
4  more real world in terms of belt interaction and
5  restraining.
6  Q  What type of material would you have used?
7  A  I don't know that I have made a study at this point in
8  time.
9  Q  Just something different?
10  A  Again, just maybe the belt positioning that's causing
11  most of that.  If you had a belt that was positioned down
12  closer to that, I don't know that the material would have
13  made all that much of a difference if he had positioned
14  it properly.
15  Q  Okay.
16  A  I just don't know enough at this point in time as to
17  parsing out which of those effects led to the performance
18  that we observed.
19  Q  Besides the positioning over some clothing material, are
20  you critical of the belt positioning?  In other words,
21  where he positioned the lap belt on the abdomen?
22  A  I don't know that I have studied that.  Mr. Blaisdell
23  did, obviously.  But it led to performance that obviously
24  increased the ramping beyond what I would normally
25  expect.

**Page 103**

1  Q  So you are not going to testify at trial that you are
2  critical of where Mr. Meyer positioned the belt on the
3  dummy's abdomen?
4  A  Specifically where, I don't know that I have studied
5  that.  I may be able to take a look at that more, but I
6  think that combination of belt positioning and the gap
7  material led to essentially the belt slipping down into a
8  location that it was.
9  Q  Right.  But when you say "belt positioning" you told me
10  earlier you meant the position over the clothing
11  material?
12  A  Correct.
13  Q  Okay.  You are not talking about position on the abdomen,
14  like, for example, was it too far up?
15  A  Well, any time you position it over clothes obviously
16  that changes the relationship, so is it more up on the
17  abdomen?  It could be as a result of that.  But it looks
18  like the wad of material does change its position.
19  Q  Obviously it changes its position, but are you critical
20  of where -- okay.
21  I believe your report, and maybe it's Mr.
22  Blaisdell's report, mentioned that the -- that lap belt
23  was positioned closer to the belly button.  I think one
24  of you said that.  Do you know whether yours did?
25  A  Mine does not, at least I don't see that.  I see "The lap

**Page 104**

1  belt was also prepositioned above a wad of shirt
2  material, potentially, artificially introducing
3  additional slack in the system."
4  Q  Okay.
5  A  And all I was clarifying for you is I don't know if that
6  increases the elevation of it closer to where you were
7  talking about as much as it just introduces additional
8  slack.
9  Q  Okay.  I gotcha.  All right.  Let's talk about Kia's
10  internal testing.  I think you had a section in your
11  report on that?
12  A  Yes, ma'am.
13  Q  You say that the Kia's internal testing is similar to but
14  slightly less severe than the subject accident, right?
15  A  I believe so, yes, ma'am.
16  Q  Okay.  So is it fair to say that the crash forces
17  experienced in the subject accident were foreseeable?
18  MR. MARTENSON:  Object to the term
19  "foreseeable."
20  THE WITNESS:  Yes, I would say that
21  anything is foreseeable once it happens.  But obviously
22  as it relates to -- maybe a better term would be normal,
23  common, frequent, infrequent, that type of thing.  If
24  that's what you mean by foreseeable, then I would think
25  that the crash severities are kind of more towards the

**Page 105**

1  infrequent side versus frequent.  I think that they would
2  be more uncommon versus common in terms of the world of
3  understanding of crashes.  Do they happen?  Absolutely.
4  Q  (By Ms. Harris)  That's why Kia tests for them?
5  A  Well, the government sets out the testing.  This testing
6  was based on the 301R, which is a 50 mile an hour
7  deformal barrier, so obviously the government is setting
8  some idea of what crash forces to include in the design
9  concepts.
10  Q  This isn't a 301 test?
11  A  No, but it's taken the data from a 301 type of test in
12  terms of severity and applying that to the seat design.
13  Q  So Kia designed the seat to withstand similar crash
14  forces?
15  A  Observed in a 301 type of test.
16  Q  Right.
17  A  And you certainly see that a little bit in their testing.
18  Q  All right.  Let's go to your figures -- your graphs on
19  Page 10.
20  A  Yes, ma'am.
21  Q  Tell me a little bit about these, Mr. Blaisdell's.
22  A  Yes, ma'am.
23  Q  And were you present for any of these tests, those block
24  tests?
25  A  I'm sure I was.  I have been doing testing since I

Gregory D. Stephens
January 26, 2018

**Page 106**

1    started with Collision Research.

2  Q  Did you tell me you were not present for the Kia Sportage

3    one?

4  A  Correct.

5  Q  Have you done any tests, block tests that were excluded

6    from this analysis?

7  A  Not to my knowledge. I think the first graph indicates

8    seat test that we have done over the last decade for

9    conventional seats. And I think the lower graph was more

10    towards a more complete set of testing.

11  Q  All right. In your notebook titled "Report," does it

12    have each of these graphs like Mr. Blaisdell's notebook,

13    set out separately?

14  A  I believe so.

15  Q  Okay. Can you just double check for me?

16  A  Yes, ma'am, it does.

17  Q  Okay. This is not a 207 test, correct?

18  A  It's a 207 type test.

19  Q  But it's not a -- there are a number of differences,

20    correct?

21  A  Yes, ma'am.

22  Q  All right. And as an engineer, do you believe that

23    compliance with FMVSS 207 alone is enough say that a

24    vehicle is safe with respect to seat performance in a

25    rear crash?

**Page 107**

1  A  I think what it does is it gives the agencies and the

2    designers and the manufacturers and the suppliers some

3    starting framework to better understand crash

4    performances in a seat system, so it gives them some

5    guides into what to test for in terms of strength,

6    capabilities, energy absorbing capabilities, and

7    interactions with structures capabilities.

8  Q  Okay. So that's a starting framework but it's not the

9    only thing that can be considered?

10  A  I believe that to be shown, yes.

11  Q  Okay. You also have to -- I believe you said before or

12    today that you need to consider energy absorption

13    capabilities, right?

14  A  Yes, I just indicated that.

15  Q  Okay. Do you have any problems or issues with the way

16    207 defines seat strength?

17  A  I'm not sure I understand your question. If your

18    question refers to just the manner in which you apply a

19    load and then do the calculations, I don't know that I

20    have a quarrel with that.

21  Q  Well, you've worked with Mr. Blaisdell for a long time,

22    right?

23  A  Yes, ma'am.

24  Q  And you have read a number of his depositions, right?

25  A  I've what?

**Page 108**

1  Q  You have read a number of his depositions?

2  A  Sure.

3  Q  Have you attended his depositions like you did today?

4  A  I can't recall any that I have attended.

5  Q  Okay. Well, he's testified in the past that he had some

6    problems with the way 207 defines seat strength, and I

7    just wondered if you shared that.

8    If you don't know what I'm talking about, that's

9    fine.

10        MR. MARTENSON: Object to the form.

11    Move to exclude.

12        THE WITNESS: I would probably need to

13    take a look at the context in which it was discussed.

14  Q  (By Ms. Harris) Right. So siting here today, you don't

15    have any criticisms or problems with the way 207 defines

16    seat strength?

17  A  Again, not completely understanding your question, but in

18    terms of just a general understanding of calculated inch

19    pounds, no. Obviously, they have other requirements in

20    there with regard to acceleration and whatnot, but I

21    don't think you are referring to that.

22  Q  Right. Okay. So you don't have any criticisms at this

23    point, right?

24  A  Correct.

25  Q  Okay. You agree that a vehicle seat that passes the

**Page 109**

1    standard but does not absorb energy -- does not safely

2    absorb energy, that would be an unreasonably dangerous

3    seat, correct?

4    You know where I'm going with this?

5        MR. MARTENSON: Move to exclude the

6    comment.

7        THE WITNESS: I don't know how that

8    would apply to various types of seats and seat designs

9    out there, so I'm not completely understanding your

10    question.

11  Q  (By Ms. Harris) Have you heard of seats that have been

12    tested such that were -- I'm sorry, like lawn chairs that

13    have been tested such that they passed 207, but we would

14    all agree would not be a safe seat for a vehicle because

15    they don't have the energy absorption capability?

16  A  So you are talking simply meet the strength of 3300 inch

17    pounds?

18  Q  Right.

19  A  But don't necessarily provide the characteristics -- the

20    safe characteristics of automotive seats? I agree.

21  Q  Okay. All right. When you -- you have three -- you

22    mentioned three tests with I believe strong seats. I

23    think they all have -- all the seats in your report --

24    and me jumping around here, but I think you can find them

25    on Page 13.

Page 110

1  A  Yes.
2  Q  These are all, all belts to seat?
3  A  Yes, ma'am, except for one of the figures in No. 27,
4     which is a comparison.
5  Q  And did you bring all the data available to you for each
6     of these tests you referenced?
7  A  Yes, ma'am.
8  Q  And you would agree that these seats are not
9     substantially similar to the Kia Sportage seat?
10 A  I don't believe they are.
11 Q  All right.
12 A  Some of them have similar strength.  I'm not sure which
13    ones, but the Kia Sportage seat had some strength
14    characteristics that pushed it up into the ABTS category.
15 Q  Did the amount of twist that you saw in the accident
16    seat, was that within the appropriate range for the Kia
17    standard?
18    MR. MARTENSON:  Object to the form.
19    THE WITNESS:  The Kia standard
20 obviously requires a different thing with regard to the
21 testing, so the testing that the Kia Motor people did met
22 the standard because of the energy and forces and
23 direction applied to the seat.
24    The twist involved in the Crittenden seat, I think,
25 provides us an understanding of the offset or

Page 111

1  prepositioned manner in which Mr. Crittenden applied the
2  load to the seat more so as a function of the specific
3  accident circumstances as opposed to meting the
4  requirement.
5  Q  (By Ms. Harris)  Okay.  So you are because of the
6     differences in the accident you can't say that the
7     Crittenden vehicle's resulting twist in the seat fell
8     below the standard?
9  A  Well, no, we have data both by Mr. Meyer and by Kia that
10    suggests that it would have met the standard in terms of
11    the twist.
12 Q  Okay.  That's just what I asked.
13 A  I apologize.
14    MS. HARRIS:  Okay.  We need to change
15 the tape so we can take a quick break.
16    THE VIDEOGRAPHER:  As we go off the
17 record then the time is 5:00 p.m., and this is the end of
18 media unit number two.
19        (Recess 5:02 p.m. to
20         5:08 p.m.)
21
22        (Mr. Gaddy exits deposition.)
23
24    THE VIDEOGRAPHER:  Okay.  We are back
25 on the record.  This is the beginning of media unit

Page 112

1  number three and the time is 5:07 p.m.
2  Q  (By Ms. Harris)  All right.  Mr. Stephens, let's -- while
3     I'm thinking about it, go through the rest of your file
4     and mark what we need to.  You have a CD with a -- it's
5     labeled "Kia document production," well, actually two CDs
6     or DVDs, and then there's an index.  Do you know whether
7     this includes all the documents produced?
8  A  It only includes what's on the disks that were in that
9     folder.
10 Q  Okay.  And do you know whether there are other documents
11    that were produced not within these two?
12 A  There may be.  It may be in some of the previous marked
13    exhibits.
14 Q  Okay.  We will go ahead and mark this index as Stephens
15    Exhibit 32.
16        (Exhibit No. 32 marked
17          for identification.)
18
19 Q  Do you need to keep those together?
20 A  If it's okay.
21 Q  I'm not marking the documents.  I don't want to add the
22    documents as an exhibit, I just want the index.
23 A  Okay.
24    MR. MARTENSON:  This is an index of
25 the Kia documents?

Page 113

1     THE WITNESS:  Yeah, that were
2  contained on those two CDs.
3     MR. MARTENSON:  Gotcha.
4  Q  (By Ms. Harris)  All right.  The corres- -- you have a
5     folder entitled "Duplicate correspondence."
6  A  Yes, ma'am.
7  Q  Duplicate correspondence?
8  A  Yes.
9  Q  It's already in the -- we have already marked all of
10    these?
11 A  I don't think so, unless you have marked the
12    correspondence folder.
13 Q  I thought there was another correspondence folder?
14 A  I don't --
15 Q  Do you know why you have a file entitled duplicate
16    correspondence?
17 A  Because I believe the original correspondence is
18    maintained at our office.
19 Q  Okay.  All right.  So these are the printed out e-mails
20    an that sort of thing?
21 A  Yes.
22 Q  And would it include all the correspondence in this case?
23 A  To my knowledge, yes, ma'am.
24 Q  Okay.  And I am marking that as Stephens Exhibit 33.
25        (Exhibit No. 33 marked

1                    for identification.)

2

3  Q  All right.  As Exhibit 34, I will mark some additional
4     documents you received from Kia, and I am going to mark
5     the index.
6                    (Exhibit No. 34 marked
7                    for identification.)

8

9  Q  And you have some documents relating to the -- well, you
10    say subject vehicle, but then you say the Tahoe, so what
11    are those?
12 A  These are subject vehicle Tahoe information.
13 Q  Okay.  That's just material you have been provided,
14    correct?
15 A  Yes, ma'am.
16 Q  And I will mark as Exhibit 36 the subject vehicle Kia,
17    general documents related to the Kia; is that right?
18 A  Yes, ma'am.
19 Q  And then you have the police report, but that's already
20    in your file, correct, in your red binder?
21 A  I don't believe so.
22 Q  Okay.  That is in what I am marking as Stephens Exhibit
23    35, which is a notebook --
24          MR. MARTENSON:  You mean 37?
25          MS. HARRIS:  Did we skip 35?

Page 114

1          MR. MARTENSON:  No.
2          THE WITNESS:  Exhibit 36 was the
3     subject vehicle.  Exhibit 35 was -- oh, the Tahoe.  We did
4     not mark it.
5  Q  (By Ms. Harris)  So let's do this.  This is Exhibit 35
6     for the Tahoe documents.
7          And Stephens 37 is for the investigative notebook,
8     which has like -- which it looks like the police report,
9     police photos, and some other photos that were not in the
10    complaint, and some other photos that were not taken by
11    you, correct?
12 A  Correct.
13                   (Exhibit Nos. 35 through 37
14                   marked for identification.)

15

16 Q  Anything else in that file that I didn't mention?
17 A  I think there's some fire and EMS document information
18    there as well, in Exhibit 37.
19 Q  All right.  These three folders appear to have photos
20    that were taken before you were in the case, and I am
21    going to mark them collectively, if you will just confirm
22    that's what they are.  Exhibit 38.
23                   (Exhibit No. 38 marked
24                   for identification.)

25

Page 115

1  A  The three folders were three folders indicated to be
2     photos produced by plaintiff and inspection, others,
3     colon, K-M-A-P-I and Messerschmidt,
4     M-E-S-S-E-R-S-C-H-M-I-D-T, Safety Consultants.
5  Q  Okay.
6  A  And I would definitely agree that a number of these were
7     taken before I was involved.
8  Q  All of them?  Well, they weren't taken by you?
9  A  They were not taken by me.
10 Q  Okay.  What about you have some photos of the exemplar
11    seat that you inspected.  Are those included in the
12    materials we have already marked?
13 A  I don't believe so.  I think those were as we received
14    the seat.
15 Q  Okay.  I'm marking those as Exhibit 30.
16 A  Thank you.
17                   (Exhibit No. 39 marked
18                   for identification.)

19

20 Q  And you have a folder titled "The head restraints," and
21    what's in there?  I'm marking it as Exhibit 40 for
22    purposes of the record.
23                   (Exhibit No. 40 marked
24                   for identification.)

25

Page 116

1  A  I believe this is a printout of the NHTSA study on head
2     restraints.
3  Q  And how does that relate to your opinions in this case?
4  A  I don't believe directly other than just the general
5     understanding of the head restraints and their studies on
6     them.
7  Q  What about this?
8  A  This was information that we had pulled concerning dummy
9     dimensions as well as IARV information.
10 Q  Okay.  And that, again, just generally relates to your
11    opinions with respect to the dummies by Mr. Meyer?
12 A  Well, dummies in general, yes, as well as the injury
13    assessment values just in general.
14 Q  Okay.  I will go ahead and mark that folder as 41.
15                   (Exhibit No. 41 marked
16                   for identification.)

17

18 Q  Okay.  Your pulse analyses comparison.  These are your
19    comparisons from the subject accident to Mr. Meyer's sled
20    test; is that right?
21 A  I don't know.  Let me check that.  I think there's a
22    comparison of the Kia testing to the subject accident.
23 Q  Okay.
24                   (Exhibit No. 42 marked
25                   for identification.)

Page 117

30 (Pages 114 to 117)

**Page 118**

1
2 A  Yes.  This is the Kia comparison to the subject accident.
3        MR. MARTENSON:  Sled test?
4        THE WITNESS:  Yes.
5 Q  (By Ms. Harris)  And you have the printout of FMVSS 207
6    and 202.  Why do you have 202 in there?
7 A  202A had to do with the testing associated with the head
8    restraint evaluations.
9 Q  And then you have your scans and these are yours,
10    correct?
11 A  Yes, ma'am.
12 Q  All right.  Do we have those electronically anywhere or
13    just the printouts?
14 A  Just the printouts right now.
15 Q  Okay.  So Exhibit 43.
16        (Exhibit No. 43 marked
17        for identification.)
18
19 Q  And the IIHS material is 44.
20        (Exhibit No. 44 marked
21        for identification.)
22
23 Q  Well, it's in another folder.  How does that support your
24    opinions?
25 A  This just shows some of the information with regard to

**Page 119**

1    the IIHS evaluation of the subject vehicle and
2    specifically obviously the head restraint and seats.
3 Q  Okay.  Now you received some deposition notices.  You got
4    the owners manual.  You got the de-trim protocol, and an
5    objection to the deposition notices right here.  Anything
6    about these that affect your opinions?
7 A  I don't believe so.
8 Q  Okay.  You brought with you today your CV?
9 A  Yes, ma'am.
10 Q  And that is going to be Exhibit 45.
11        (Exhibit No. 45 marked
12        for identification.)
13
14 Q  Is that a true and accurate copy of your CV?
15 A  Yes, ma'am.
16 Q  I should ask, is it up to date?
17 A  Well, that's a different question.  I haven't updated it
18    in quite a while.  Yes, I believe that there's probably
19    some additional stuff on here and some things have
20    changed names.
21 Q  Okay.  Tell me what changes you have made or would make
22    to that CV to make it up to date.
23 A  Well, certainly in my experience.  I think by now, and I
24    think -- I mean, I haven't said it in my report, but I
25    think I'm up to over 1800 crashes that I have looked at

**Page 120**

1    over the years.
2        I think that in terms of research activities I have
3    researched and studied rollovers, and actually on the
4    second page I have published on that which I don't think
5    is on here.
6        And I think some of these professional affiliations
7    in terms of the committees and the SAE subcommittees have
8    changed names.
9 Q  Do you have an up to date CV?
10 A  I don't.  I need to, but I haven't.
11 Q  Okay.  All right.  Have you published anything related to
12    seat design that's not on there?
13 A  I think all my pubs and presentations regarding seats are
14    all on here.
15 Q  Okay.  And what SAE subgroups are you a member of that
16    are not listed?
17 A  I'm not sure if I have listed the Dynamics Committee.
18    And I think the Reconstruction Practices Committee has
19    changed names.  I think the Seat Standards Committee has
20    probably long since disbanded, but -- I think that's
21    mostly it.
22 Q  Okay.  I'm marking as Exhibit 46 your testimony list.
23 A  Yes, ma'am.
24        (Exhibit No. 46 marked
25        for identification.)

**Page 121**

1
2 Q  Tell me how many of those cases did you testify outside
3    of -- excuse me -- accident reconstruction?
4 A  How many of these cases have I testified outside?
5 Q  Outside of accident reconstruction.
6 A  I would say that there's a number of these where I have
7    done reconstruction and some aspects of seat design, and
8    maybe even some related to door system design.
9 Q  Okay.  Which ones have you offered opinions about seat
10    performance and seat design?
11 A  I think -- off the top of my head, I think there was some
12    seat aspect opinions associated with Thomas, some with
13    Portis.
14 Q  You offered design opinions in Portis?
15 A  I believe I offered some collision performance and
16    collision seat evaluation opinions in Portis.
17 Q  Okay?
18 A  A little bit in Panarello.
19 Q  Panarello?
20 A  Yes, ma'am.
21 Q  Versus who?  What file number is that?
22 A  I don't have a number.  Oh, what file number.  It's
23    160906.
24 Q  Okay.  Which other ones?
25 A  I believe Melgar, M-E-L-G-A-R.

31 (Pages 118 to 121)

1 Q   And what vehicle was involved in that case?
2 A   I don't recall.  If memory has it, it was a minivan.
3      Gray versus Mazda.  A little bit in Fitzgerald.  And
4   that's all I can recall of this list right now.
5 Q   In all those cases, did you testify that a seat was not
6   defective, the seat at issue was not defective?
7 A   I would probably have to go back and review my testimony
8   on that.  I don't recall any such opinions.
9 Q   You don't recall any such opinions.
10 A   Meaning of defect, defective.
11 Q   Okay.  Right.  But did offer the opinions that they were
12   not defective?
13 A   I would have to re-review all my work on that.
14 Q   Okay.  Have you ever offered an opinion that a seat was
15   defective?
16 A   I don't think anything that resulted in testimony, in my
17   memory.
18 Q   Have you ever offered opinions to anyone, regardless of
19   whether you testified, that a seat was defective?
20 A   I'm sure I have found some conditions that were
21   defective.  I just don't recall them as I sit here.
22 Q   You can't identify any vehicle seat you found to be
23   defective?
24 A   Not as I recall sitting here.
25 Q   All right.  I'm marking your folder titled "OOP images,"

                                              Page 122

1   as Exhibit 47?
2 A   Yes. This one is 46.
3              (Exhibit No. 47 marked
4                 for identification.)
5
6 Q   What is this folder?  What are these images?
7 A   These just are various diagrams and depictions of how an
8   occupant would be in various stages of an out of position
9   that would effectively interact with the seat in various
10   manners.  And obviously, that would have some bearing and
11   effect on injury and performance.
12 Q   Is that a Kia Sportage vehicle that you have in those
13   images?
14 A   No, ma'am.
15 Q   Just a generic vehicle?
16 A   Yes, ma'am.
17 Q   Okay.  Did you attempt to replicate Mr. Crittenden's size
18   and weight in doing those, creating those images?
19 A   No, ma'am.
20 Q   Did you do that for this case or were those images that
21   you use in other cases?
22 A   These were images that I had done for some presentations
23   slash research.
24 Q   Okay.  So they weren't specific for this case?
25 A   They weren't specific for any case.

                                              Page 123

1 Q   All right.  Do you have an opinion as to whether Mr.
2   Crittenden was in the position of any of those that
3   person in the illustrations?
4 A   Again, beyond what we have talked about, I haven't made
5   that evaluation.
6 Q   Can you pull out any of those images and say you believe
7   more likely than not Mr. Crittenden was in this position?
8 A   I would defer to Dr. Banks on specific positioning.
9   However, if, for example, one of these images has him
10   leaning one way or another on the seat which would
11   provide asymmetric loading much like you and I have
12   talked about.  I would suggest that that might be
13   something either, again, by medical condition or by his
14   own volitional preprepositioning that would have affected
15   that seat performance in the manner that you and I have
16   talked about.
17 Q   Okay.  Are all those -- do all of those images depict
18   occupants, an occupant who is out of position?
19 A   No.
20 Q   They don't?
21 A   No.
22 Q   Okay.  Do those images have any numbers on them?
23 A   No.
24 Q   All right.  If you will pull out for me the images that
25   you believe depict an occupant out of position.

                                              Page 124

1 A   I think the starting position is essentially an in
2   position.
3 Q   Okay.  I want you to pull out the ones you believe the
4   occupant is out of position.
5 A   And, again, it depends on how you define out of position
6   and what it means.
7 Q   You defined it, so --
8 A   I don't know that I defined it, but obviously these give
9   several examples of it, which is essentially an occupant
10   that is not ideally positioned for crash forces.
11 Q   Okay.  Pull out all the images depicting an occupant
12   out of position, please.
13 A   (Witness complies.)
14 Q   Got it.
15 A   Yeah, I just turned up on the side various stages of out
16   of positions, remembering that there's two different
17   views on there so they actually show some of the same
18   positions from different viewpoints.
19 Q   Okay.  I will pull out all the ones that you have turned
20   up and I am going to mark those as Exhibit 48, and you
21   can double check that.
22              (Exhibit No. 48 marked
23                 for identification.)
24
25 Q   Exhibit 48 is all the ones you consider to be out of

                                              Page 125

32 (Pages 122 to 125)

| | |
|---|---|
| 1  position? | 1  that at this point. |
| 2  **A  Some various stages of out of position through two** | 2  Q  What is Crittenden Fard, is that your scans? |
| 3  **different viewpoints.** | 3  **A  Faro?** |
| 4  Q  All right.  Do you assume a normal spine for all of those | 4  Q  It says F-A-R-D, unless it's a typo. |
| 5  images for the occupant in all of those images? | 5  **A  Oh, it's Meyer's Exhibit No. 12.** |
| 6  **A  Again, I haven't assumed really any type of a spine per** | 6  Q  Okay.  And these also appear to be Mr. Meyer's exhibits |
| 7  **se, as much as I'm trying to illustrate various stages of** | 7  which you brought a hard copy as well, correct? |
| 8  **out of position in terms of the operation of the vehicle.** | 8  **A  Yes, ma'am.** |
| 9  Q  You brought with you a group of thumb drives that say | 9  Q  Okay.  Have we -- you have a group of thumb drives that |
| 10  "Bad media" on the top? | 10  don't have a label on the outside, but they are labeled |
| 11  **A  Yes.** | 11  "Plaintiff's initial disclosure documents and plaintiff's |
| 12  Q  What is that?  What does that mean? | 12  response to Kia's RFP," so these are documents produced |
| 13  **A  It appears that at least some of the documents indicated** | 13  by the plaintiff? |
| 14  **on there were somehow bad and --** | 14  **A  It sounds like it.** |
| 15  Q  Corrupted? | 15  Q  Did you review these? |
| 16  **A  -- corrupted or something along those lines.** | 16  **A  If they are in part of some of the legals and whatnot, I** |
| 17  Q  Okay.  So did you ask for other copies of those | 17  **may have reviewed them.** |
| 18  documents? | 18  Q  Okay.  Was there anything significant to your opinions in |
| 19  **A  Presumably.** | 19  these documents? |
| 20  Q  And they would be included in other parts of your file? | 20  **A  Again, not that hasn't been pulled out and marked** |
| 21  **A  I would think so.** | 21  **already.** |
| 22  Q  Okay.  Well, are they? | 22  Q  Okay.  So have we either marked or identified all the |
| 23  **A  I don't have any way of knowing.  I would need to** | 23  documents in your file today? |
| 24  **probably check the numbers referenced on there to see if** | 24  **A  What was that folder underneath Meyer's?** |
| 25  **I have them reflected anywhere else, and I don't know** | 25  Q  Medical records we pulled those out. |
| Page 126 | Page 127 |

| | |
|---|---|
| 1  **A  Okay.** | 1  (Exhibit No. 50 marked |
| 2  Q  And then the EDR we pulled out. | 2  for identification.) |
| 3  **A  Okay.** | 3 |
| 4  Q  You can put those back in the folders if you want to. | 4  Q  I'm not sure that I have ever marked 50 exhibits ever. |
| 5  **A  The only other two groups of notebooks that I mentioned** | 5  All right.  Anything else that we haven't either |
| 6  **at least, is the Docket, the 89-20 Docket, which is** | 6  identified or marked? |
| 7  **volume two over there and volume one over here.** | 7  **A  I think you have successfully marked everything but De's** |
| 8  Q  It's a NHTSA docket? | 8  **briefcase.** |
| 9  **A  Yes.** | 9  MR. MARTENSON:  I'm keeping it away |
| 10  Q  Let me just see those, the 89-20. | 10  from her. |
| 11  MR. MARTENSON:  Is that the NPRM | 11  Q  (By Ms. Harris)  Let's end on a round number.  Did we |
| 12  docket? | 12  mark your billing records? |
| 13  THE WITNESS:  I believe it's the NPRM. | 13  **A  I seem to remember that was early on.** |
| 14  It also has the responses.  It has everything on the | 14  Q  Okay. |
| 15  89-20. | 15  MR. MARTENSON:  Exhibit 24. |
| 16  Q  (By Ms. Harris)  I am going to mark just the index for | 16  Q  (By Ms. Harris)  All right.  I am not going to go over |
| 17  these as Exhibit 49. | 17  your professional background because I've -- well, let me |
| 18  (Exhibit No. 49 marked | 18  ask you this. |
| 19  for identification.) | 19  Has that changed since -- you gave a deposition in |
| 20 | 20  January, right? |
| 21  Q  What was the other? | 21  **A  Yes, ma'am.** |
| 22  **A  Volume two of that.** | 22  Q  Okay.  Has anything regarding your professional |
| 23  Q  Where is that? | 23  background changed since then?  Well, it's still January, |
| 24  **A  It's right in front of you.** | 24  since early January? |
| 25  Q  Okay.  So Exhibit 50 will be the index to that volume. | 25  **A  I don't believe so.** |
| Page 128 | Page 129 |

| | |
|---|---|
| 1 Q  Okay. | 1 A  How do you spell it again? |
| 2 A  Obviously we talked about my CV and some changes. | 2       MR. MARTENSON:  E-U-T-A-W. |
| 3 Q  Right.  I'm not sure if you were so I'm going to ask | 3       THE WITNESS:  I think that's the only |
| 4 this. | 4 one I recall on here being for their firm. |
| 5     How many cases have you worked on for Mr. Martenson | 5 Q  (By Ms. Harris)  Okay.  What about any cases prior to |
| 6 or any member of his firm? | 6 your four-year list? |
| 7 A  I don't know as I sit here.  I think there's some on my | 7 A  I'm sure there was, but I don't recall. |
| 8 four-year list that were for his firm. | 8 Q  You mentioned that you testified in court.  That was a |
| 9 Q  Okay.  Why don't you pull that out and identify those for | 9 Kia vehicle, right? |
| 10 me. | 10 A  Yes, ma'am. |
| 11       MR. MARTENSON:  Exhibit 46. | 11 Q  And you testified as a design expert? |
| 12       THE WITNESS:  Okay.  Hardy, H-A-R-D-Y | 12 A  That accident reconstruction and performance evaluation. |
| 13 versus Ford. | 13 Q  Do you know whether there were any other seat performance |
| 14 Q  (By Ms. Harris)  Is that a seat back case? | 14 evaluation experts in that case? |
| 15 A  No, ma'am. | 15 A  I believe there were. |
| 16 Q  What was the allegation in that case? | 16 Q  Who? |
| 17 A  Restraints, I think. | 17 A  I believe Mr. Meyer was one. |
| 18 Q  Was it an Explorer? | 18 Q  I'm sorry.  I meant for either JCI or Kia. |
| 19 A  It was an Explorer Sport Trac truck in Alabama, Eutaw | 19 A  I thought Dr. Viano was involved in that. |
| 20 maybe. | 20 Q  Viano was for JCI, correct, or were you? |
| 21       MR. MARTENSON:  E-U-T-A-W. | 21 A  I think I was working for counsel representing JCI.  My |
| 22       THE WITNESS:  I think this trial | 22 memory was that Dr. Viano was working for counsel |
| 23 location is wrong.  It says Birmingham, so can I change | 23 representing Kia. |
| 24 it? | 24 Q  Okay.  All right.  Have we -- have you completed your |
| 25 Q  (By Ms. Harris)  Sure. | 25 work in this case? |
| Page 130 | Page 131 |

| | |
|---|---|
| 1 A  Again, with the exception of taking a look at all | 1 test having deformed the seat too much, and I think you |
| 2 additional discovery, and certainly preparing for trial | 2 elicited that information.  I believe we talked about |
| 3 and evaluating any other evidence that comes forward. | 3 it's affect on the ramping and the occupant positioning. |
| 4 Q  Okay.  Do you anticipate doing any additional testing? | 4 So, yes, I believe we have.  Everything that I a am -- |
| 5 A  If the need arises. | 5 can aware of -- be aware of at a quarter of six. |
| 6 Q  Do you anticipate sitting here today doing any additional | 6       MS. HARRIS:  Okay.  Let's take a quick |
| 7 testing? | 7 break.  I may have a few questions just that I did not |
| 8 A  Again, not given what we know today, but if the need | 8 hit and then we can be done. |
| 9 arises for additional testing based on additional | 9       THE VIDEOGRAPHER:  With permission of |
| 10 information. | 10 counsel as we go off the record the time is 5:45. |
| 11 Q  Right.  But assuming no additional information you don't | 11       (Recess 5:45 p.m. to |
| 12 intend to do any additional testing? | 12       5:48 p.m.) |
| 13 A  That would be a correct statement. | 13 |
| 14 Q  Have we gone over all of your opinions today? | 14       THE VIDEOGRAPHER:  We are back on the |
| 15 A  I would believe major ones for sure. | 15 record.  The time is 5:48. |
| 16 Q  What about the minor ones? | 16 Q  (By Ms. Harris)  On Page 15 of your report, got that |
| 17       MR. MARTENSON:  Anything that you know | 17 handy? |
| 18 that you can think of that has not been covered. | 18 A  Yes, I do. |
| 19 Q  (By Ms. Harris)  We still got a long time on the clock. | 19 Q  All right.  You list five mechanisms for an out of |
| 20 A  You too.  No, I think we have hit the ones that as it | 20 position occupant, or conditions, excuse me, that may |
| 21 relates to this case. | 21 exist at the time of rear-end crash, and then you list |
| 22 Q  I don't want your opinions on who is going to win the | 22 the five conditions.  Which ones do those apply to our |
| 23 Super Bowl.  I'm just talking about your opinions as it | 23 case? |
| 24 relates to this case. | 24 A  Well, if there's intentional movement if that goes into |
| 25 A  I believe you asked me earlier about Mr. Meyer's sled | 25 it would obviously be related. |
| Page 132 | Page 133 |

1  Q  Which we just don't know, right?
2  A  Again, just looking at the seat deformation would suggest
3     that you're positioned on one side or the other.
4  Q  But do you know which one of -- like, which one of these
5     things, or which one of these intentional movements Mr.
6     Crittenden was doing, if any?
7  A  Not specifically.  I would just suggest that either,
8     again, by prepositioning by medical condition or by
9     reconstruction or some combination of all three, tend to
10    produce the loading and the deformation on the outboard
11    side of the seat.
12 Q  Do you know whether he was A, reaching for something to
13    the left or the right?
14 A  I do not.
15 Q  Do you know whether he was attending to a child in the
16    rear?
17 A  My understanding is there was no children in the rear.
18 Q  Do you know whether he was looking around the head
19    restraint to see what was coming from the rear?
20 A  I do not.
21 Q  Do you know whether he was lifting up the seat to put on
22    or take off an item of clothing?
23 A  I do not.
24 Q  Do you know whether he was leaning forward away from the
25    seat to reach -- to reach or for comfort?

Page 134

1  A  I do not.
2  Q  All right.  So number two doesn't apply, correct?
3  A  I don't believe so, not in this crash.
4  Q  All right.  Number three doesn't apply?
5  A  Oh, he is not turning right or left, that's correct, but
6     it is impact by an inattentive driver.
7  Q  Right.  But that doesn't relate to him being out of
8     position?
9  A  Well, the oblique and angular nature of it, that's
10    correct.  It doesn't apply to that.
11 Q  Okay.  What about number four?
12 A  I would defer to Mr. Hoover on this, but obviously the
13    Tahoe is a larger vehicle.
14 Q  Well, do you know whether -- you read his report,
15    correct?
16 A  Yes.
17 Q  Did he mention this?
18 A  I didn't see a significant reference to override or
19    underride.
20 Q  Okay.  And you inspected the vehicles yourself, right?
21 A  I sure did.
22 Q  And you are qualified to do an accident reconstruction?
23 A  I have been, yes.
24 Q  Did you see any evidence of override or underride?
25 A  I saw some unique damage patterns on the back that --

Page 135

1     but, again, I would defer to him on how he's three
2     dimensionally lined them up.
3  Q  Okay.  Do you think any amount of override or underride
4     affected the injury causation?
5  A  I would defer to Dr. Banks on that?
6  Q  So you don't have an opinion one way or the other?
7  A  That's correct.
8  Q  Have you quantified any override or underride?
9  A  No, I haven't.
10 Q  Have you spoken with Mr. Hoover in this case?
11 A  I believe only at the inspection of the vehicles.  I
12    believe he was there when I inspected the vehicles.
13 Q  Okay.  Have you spoken with any other experts in this
14    case besides Mr. Hoover or Dr. Banks?
15    Obviously, you spoke with Mr. Meyer during the
16    inspections.
17 A  Yes.
18 Q  But anyone else?
19 A  Mr. Kennett, yes.
20 Q  Okay.  Anybody else?
21 A  I don't think so.
22 Q  All right.  Number five doesn't apply to this case,
23    correct?
24 A  That's correct.
25 Q  All right.  Have you attempted to quantify the amount of

Page 136

1     force applied during the active sequence to Mr.
2     Crittenden, or are you going to leave that to Dr. Banks?
3  A  Well, specifically, we have information regarding that,
4     vis a vis the seat deformation that we talked about and
5     the load required to bend it in the manner that it was.
6  Q  Okay.  And what is the load required to bend it in the
7     manner that it was?
8  A  Over 41,000 inch pounds.
9  Q  So you -- any other information which identifies the
10    amount of force required to cause the deformation besides
11    the tests that you had -- or that Mr. Blaisdell did?
12 A  Well, and obviously our understanding of the seat
13    performance of Mr. Meyer's test, and the Kia testing
14    relative to testing where we have instrumented dummies.
15 Q  Anything else?
16 A  No, ma'am.
17 Q  Okay.  All right.  You kept your billing records in front
18    of you.  Did you have any face to face meetings with any
19    of the other experts?
20 A  No, ma'am.
21 Q  How many -- you said you remember one call with Dr.
22    Banks, correct?
23 A  Yes, ma'am.
24 Q  And you just spoke with Mr. Hoover at the inspections,
25    right?

Page 137

35 (Pages 134 to 137)

1  A  Yes, ma'am.
2  Q  And besides counsel for Kia, did you have any meetings
3     within -- well, within your firm about this case?
4  A  Well, I have certainly talked to Mr. Blaisdell as we were
5     evaluating the case and working up all the materials.
6  Q  Did you come to opinions independently, or did you come
7     to an opinion together about the safety performance of
8     this seat?
9  A  I'm not sure I understand the question.
10 Q  Well, did you each form your opinions and then say hey, I
11    don't think this seat is defective, or did you
12    collaborate together and say, okay, together we looked at
13    this information and we don't believe the seat is
14    defective?
15 A  Well, what we did was take a look at all the available
16    information.  And obviously I had performed work that he
17    did not, and he performed work that I did not, and we
18    took that into account when both of us, I'm sure, were
19    making or respective evaluations.
20 Q  Did you collaborate on the -- on your reports?
21 A  Well, he certainly helped me out with my report in terms
22    of getting some of the materials put together in the
23    fashion that he did.  I don't believe I helped him out
24    with his report as much.
25 Q  All right.  Did you -- do you have any drafts?

Page 138

1  A  No, ma'am.
2            MS. HARRIS:  All right.  Those are all
3     the questions I have for you.
4            MR. MARTENSON:  Thank you.  On the
5     record, the witness would like to read and sign so just
6     send me the errata.  And I would like to get an e-tran
7     and then I would like an actual paper copy with all the
8     paper exhibits.  And the e-tran would also have
9     electronic exhibits.
10           THE VIDEOGRAPHER:  As we go off the
11    record, this is the end of media unit number three, and
12    the time is 5:56 p.m.
13
14           (Signature reserved.)
15           (Deposition concluded
16            at 5:56 p.m.)
17 ///
18 ///
19 ///
20 ///
21 ///
22 ///
23 ///
24 ///
25 ///

Page 139

1        STATE OF WASHINGTON )   I, CHRISTY SHEPPARD,
                             ) ss CCR #1932, a duly Certified
2    County of Pierce    )   Court Reporter, in and for the
                             State of Washington residing
3                            at Buckley, do hereby certify:
4        That the foregoing deposition of GREGORY D.
     STEPHENS was taken before me and completed on January 26,
5    2018, and thereafter was transcribed under my direction;
     that the deposition is a full, true and complete
6    transcript of the testimony of said witness, including
     all questions, answers, objections, motions and
7    exceptions;
8        That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
         That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or
     employee of any such attorney or counsel and that I am
12   not financially interested in the said action or the
     outcome thereof;
13
         That I am herewith securely sealing the said
14   deposition and promptly delivering the same to Attorney
     Rebecca Franklin Harris.
15
         IN WITNESS WHEREOF, I have hereunto set my
16   signature on this 31st day of January, 2018.
17
18
19
         Christy Sheppard, CCR, RPR
20       Certified Court Reporter No. 1932
         (Certification expires 05/06/18.)
21
22
23
24
25